The PEOPLE OF THE VILLAGE OF GAMBELL, an Alaskan Native IRA Association, and the People of the Village of Stebbins, an Alaskan Native IRA Association, Plaintiffs–Appellants,

v.

Donald P. HODEL,* Secretary of the Interior, and the United States Department of the Interior, Defendants–Appellees,

and

Arco Alaska, Inc.; Exxon Corporation; Mobil Oil Corporation; Shell Oil Company; Texaco, Inc.; and Union Oil Company of California, Applicants–for–Intervention as Defendants–Appellees.

The PEOPLE OF THE VILLAGE OF GAMBELL, an Alaskan Native IRA Association, and Nunam Kitlutsisti, a Native Intertribal Organization, Plaintiffs–Appellants,

v.

Donald P. HODEL, Secretary of the Interior, and the United States Department of the Interior, Defendants–Appellees,

Amoco Production Company; Arco Alaska, Inc.; Exxon Corporation; Shell Western E & P, Inc.; Sohio Alaska Petroleum Company; Texaco, Inc.; and Union Oil Company of California, Applicants for Intervention as Defendants–Appellees.

Nos. 83–3735, 83–3781 and 85–3877.

United States Court of Appeals, Ninth Circuit.

Argued Dec. 16, 1987.

Submitted Jan. 15, 1988.

Decided March 9, 1989.

---

* Donald P. Hodel, the current Secretary of the Interior, is substituted for former Secretary James G. Watt pursuant to Fed.R.App.P. 43(c)(1).

Donald S. Cooper and Carol H. Daniel, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs-appellants.

Laura E. Frossard, Dept. of Justice, Washington, D.C., for defendants-appellees.

E. Edward Bruce, Covington & Burling, Washington, D.C., for applicants-for-intervention-as defendants-appellees.

Before WALLACE,** CANBY and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

## BACKGROUND

In 1983, appellee Secretary of the Interior ("Secretary") began leasing 2.4 million acres of submerged land off the western shore of Alaska. The leases were for purposes of oil and gas exploration pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), ch. 345, 67 Stat. 462 (1953) (codified as amended at 43 U.S.C. § 1331 et seq.). Appellee oil companies submitted bids for these leases.

Appellant Tribal Villages of Gambell and Stebbins ("Villages") sought to enjoin the sale of lease # 57 in district court. The Villages claimed that they possessed rights to subsistence hunting and fishing in the area of the lease pursuant to the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub.L. No. 96–487, 94 Stat. 2371 (1980) (codified at 16 U.S.C. § 3101 et seq.). They argued that the Secretary had failed to satisfy the procedural requirements of ANILCA. Alternatively, the Villages claimed that they possessed aboriginal subsistence rights in the area, derived

from common law. They argued that these rights must be adjudicated before the lease-sale may take place.

The district court denied the Villages' request for a preliminary injunction, and the lease was sold. Subsequently, the district court entered summary judgment for appellees. It made two determinations of law: 1) that ANILCA did not apply to lands situated on the outer continental shelf ("OCS"); and 2) that the Villages had no aboriginal subsistence rights in the OCS because such rights would be inconsistent with the external sovereignty of the United States.

On appeal, this court affirmed in part, reversed in part, and remanded the case to the district court. On the issue of aboriginal subsistence rights, this court assumed that such rights existed at one time, but held that they were extinguished by the Alaska Native Claims Settlement Act ("ANCSA"), Pub.L. No. 92–203, 85 Stat. 688 (1971) (codified at 43 U.S.C. § 1601 et seq.). On the issue of statutory rights under ANILCA, this court held that ANILCA did apply to the OCS. *See People of the Village of Gambell v. Clark,* 746 F.2d 572 (9th Cir.1984). Therefore, whereas the Villages were denied statutory and common law relief in the district court, they were enabled to maintain their statutory claim on remand.

On petition, the Supreme Court reversed this court's statutory ruling. It agreed with the district court that ANILCA did not extend to the OCS. Rather than affirm this court's ruling that no aboriginal subsistence rights survived ANCSA, which would have disposed of the case entirely, the Court vacated that ruling and remanded it for reconsideration. This is the current posture of the case. *See Amoco Production Company v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

If the Villages are to prevail in this action, they now must do so by showing that they possess aboriginal subsistence rights

** Judge Wallace was drawn to replace Judge Tang. He has listened to the tape of oral argument held on December 16, 1987.

in the OCS that have not been extinguished or preempted. Appellees have raised the following challenges to the existence of those rights, each of which was asserted below: First, that the existence of aboriginal subsistence rights in the OCS is inconsistent with the external sovereignty of the United States; second, that those rights cannot exist because the United States has not extended its full sovereignty to the OCS; third, that the existence of those rights is inconsistent with principles of international law; fourth, that if aboriginal subsistence rights in the OCS did exist, they were extinguished by ANCSA; and finally, that if those rights did exist, they were preempted by OCSLA. We address appellees' contentions in turn.[1]

## A. *External Sovereignty*

Appellees argue, and the district court held, that the Villages possess no aboriginal rights in the OCS based on the holding in *Inupiat Community of the Arctic Slope v. United States*, 548 F.Supp. 182 (D. Alaska 1982), *aff'd on other grounds*, 746 F.2d 570 (9th Cir.1984), *cert. denied*, 474 U.S. 820, 106 S.Ct. 68, 88 L.Ed.2d 56 (1985). In *Inupiat*, the Natives (amici in the present case) sought to enjoin similar lease-sales by claiming sovereign rights to portions of the OCS. In rejecting this claim, the district court held that such an assertion of Native sovereignty was inconsistent with the external sovereignty of the United States. *See id.* at 185. The court relied on a line of Supreme Court authority sometimes referred to as the "paramountcy cases." *See United States v. Maine*, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975); *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950); *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

■ The paramountcy cases stand for the proposition that the national government has "paramount" interests in ocean waters and submerged lands below the low water mark ("adjacent waters"). Any claims of right that are inconsistent with national paramountcy, such as state ownership of the seabed beneath adjacent waters, cannot be recognized.[2] *See, e.g., California*, 332 U.S. at 38–39, 67 S.Ct. at 1668–69. In *Inupiat*, the Natives tried to distinguish the paramountcy cases by limiting them to their facts—a dispute between national and state governments. However, the district court realized that this was a distinction without a difference, and that a claim of sovereignty over adjacent waters, by any party other than the United States, is equally repugnant to the principles set forth in the paramountcy cases. *See Inupiat*, 548 F.Supp. at 185.

■ The *Inupiat* decision does not control the present case because the Villages are not asserting a claim of sovereign rights. Rather, they contend that they possess rights of occupancy and use that are subordinate to and consistent with national interests.[3] This argument is persuasive.

---

1. Because this appeal is before us on the grant of a motion for summary judgment, we must resolve all factual disputes in favor of the nonmoving party, namely the Villages. *See Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). Of particular importance in this case are those disputed facts surrounding the existence or non-existence of the Villages' asserted aboriginal rights. Because this factual issue was not resolved in the district court, nor should it have been on a motion for summary judgment, we cannot resolve it in the first instance here. We address only the district court's decision that the Villages' aboriginal rights do not exist as a matter of law.

2. As noted by the Supreme Court in *Maine*, 420 U.S. at 524–25, 95 S.Ct. at 1160–61, Congress exercised its paramount interests by enacting

the Submerged Lands Act ("SLA"), ch. 65, 67 Stat. 29 (1953) (codified at 43 U.S.C. § 1301 et seq.). In § 4 of SLA, 43 U.S.C. § 1312, Congress extended the seaward boundary of each coastal state to include the marginal sea, that portion of the adjacent waters extending seaward three miles from the low water mark. Thus, a state claim of ownership of the seabed beneath the marginal sea may now have merit.

3. Because the Villages assert merely a right to occupy and use, rather than title to, the OCS, another line of cases cited by appellees is inapplicable. *See, e.g., Utah Div. of State Lands v. United States*, 482 U.S. 193, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987); *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *United States v. Holt State Bank*, 270

That aboriginal rights may exist concurrently with a paramount federal interest, without undermining that interest, is clearly expressed in *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 233–36, 105 S.Ct. 1245, 1250–52, 84 L.Ed.2d 169 (1985). It has been settled United States policy that federal sovereignty is "subject to" the Indians' right of occupancy. *See Cramer v. United States,* 261 U.S. 219, 227, 43 S.Ct. 342, 344, 67 L.Ed. 622 (1923); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681 (1823).

Thus, we reverse the district court and hold that the federal government's paramount interests in the OCS do not extinguish the asserted aboriginal rights of the Villages. That it subordinates those aboriginal rights is certain. The issue then becomes whether the Secretary properly exercised the government's superior interests. This is discussed in section E of the opinion below.

### B. *Degree of Sovereignty*

Appellees next argue that, although the United States has paramount interests in the adjacent waters, it has not asserted full territorial sovereignty over the OCS. They contend that unless the federal government has taken the equivalent of a fee interest in land, a dependent property or possessory right cannot be recognized. The Villages claim that the degree of sovereignty exercised is of no consequence.

Underlying the aboriginal rights doctrine are concerns of humanity and policy. As the Supreme Court said in *Johnson* 21 U.S. at 589–90, in the event of a conquest,

> the conquered shall not be wantonly oppressed.... [H]umanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old, and that confidence in their security should gradually banish the painful sense of being separated from their an-

cient connections and united by force to strangers.

Appellees are correct when they state that the extension of United States sovereignty to the OCS has not been complete; Congress stated its policy that "the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein" were not to be affected by the Act. 43 U.S.C. § 1332(2). Nor has it been a conquest in the traditional sense. However, as a practical matter, the United States has extended its dominion 200 miles beyond the three-mile marginal sea. OCSLA § 4, 43 U.S.C. § 1333(a)(1) clearly states: "The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf ... to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." The same sentiment is exhibited in § 3(15)(B) of the Marine Mammal Protection Act, Pub.L. No. 92–522, 86 Stat. 1028 (1972) (codified as renumbered and amended at 16 U.S.C. § 1362(14)(B)); and § 101 of the Fishery Conservation and Management Act, Pub.L. No. 94–265, 90 Stat. 336 (1976) (codified as amended at 16 U.S.C. § 1811); *see also* Proclamation No. 5030, 48 Fed.Reg. 10605 (1983) (establishment of 200 mile exclusive economic zone). Through these enactments and declarations of policy, the federal government has exerted significant control over the OCS.

In the present case, the United States has attempted to exercise this control by leasing portions of the OCS, thereby creating contractual uses in the lessee oil companies. The Villages claim that these newly created contractual uses threaten the Villages' preexisting subsistence use of the same portions of the OCS. Thus, this alleged conflict between old and new users of the OCS has arisen out of those aspects of sovereignty over the OCS which the United States apparently possesses, the power to lease and restrict use.

U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926). These cases involve federal reservations of territorial lands, and essentially hold that except in rare

circumstances, title to land under navigable waterways located on the reservation is presumed to vest in the State when admitted to the Union.

We find that, under these circumstances, the concerns underlying the aboriginal rights doctrine, quoted from *Johnson* above, are fully implicated. "Humanity demands and a wise policy requires", that the aboriginal subsistence rights of the Villages not be ignored, if in fact they exist in the area of the OCS that has been leased in this case. There is no justification for withholding recognition of aboriginal rights in the OCS merely because the United States has not exerted other aspects of its territorial sovereignty in that region which are wholly unrelated to the conflict alleged today.

Consequently, we hold that the United States has assumed sufficient control over the OCS constituting sovereignty which requires recognition of aboriginal rights in the OCS; appellees challenge on the basis of limited federal sovereignty is therefore without merit.

### C. *International Law*

■ In a closely related challenge, appellees argue that recognition of the Villages' alleged aboriginal rights would be inconsistent with principles of international law. Their argument can be summarized as follows: First, the Villagers, as United States citizens, may not possess rights in the high seas in excess of those possessed by the United States. Second, neither the United States nor any nation may exclude others from using the high seas. Third, recognizing the Villages' aboriginal hunting and fishing rights would necessarily exclude other users of the high seas. Therefore, they reason that these aboriginal rights should not be recognized.

We see no reason to resolve this issue under the facts of this case. This case presents a dispute between the Villages, the Secretary, and the oil companies. Any conflict with the international community is purely speculative. If such conflict arises in the future, it should be resolved at that time.

### D. *Extinguishment by ANCSA*

■ Appellees further argue that even if the Villages did possess aboriginal subsist-

ence rights in the OCS, those rights were extinguished when ANCSA was enacted in 1971. During the initial appeal of this case, this court held that ANCSA did indeed extinguish the Villages' asserted rights in the OCS. *See Gambell*, 746 F.2d at 579. We now revisit this issue in light of the Supreme Court's decision in *Amoco* to vacate our holding and remand the case for reconsideration. *See Amoco*, 107 S.Ct. at 1409.

In *Amoco*, the Supreme Court held that the protection of subsistence hunting and fishing provided by ANILCA does not extend to the OCS. Rather, the Court limited application of ANILCA to the geographical boundaries of the State of Alaska, which extend seaward no further than three miles. The Court's holding turned on its construction of the statutory language that defines the territorial scope of ANILCA: "land situated in Alaska." 16 U.S.C. § 3102(3). It determined that the quoted language has a "precise geographic/political meaning" that by definition does not include the OCS. *Amoco*, 107 S.Ct. at 1405. It went on to determine that nothing in the structure of ANILCA, or its relationship to other statutes—namely the Alaska Statehood Act ("ASA"), Pub.L. No. 85–508, 72 Stat. 339 (1958) (codified as amended at note preceding 48 U.S.C. § 21) and ANCSA—compelled a contrary conclusion. *Amoco*, 107 S.Ct. at 1406–08. The Court then stated: "When statutory language is plain, and nothing in the Act's structure or relationship to other statutes calls into question this plain meaning, that is ordinarily 'the end of the matter.'" *Id.* at 1408 (*quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2786, 81 L.Ed.2d 694 (1984)).

*Amoco* has undermined much of this court's prior opinion on the ANCSA issue. In *Gambell*, this court believed that the territorial scope of aboriginal claims extinguished by ANCSA, defined by the words "in Alaska," is facially subject to two interpretations. 746 F.2d at 575. Based on this ambiguity, the court embarked on a detailed scrutiny of the legislative history of ANCSA. *Id.* at 575–79. It ultimately concluded that ANCSA was intended to extin-

guish all aboriginal claims, including those pertaining to the OCS. *Id.* at 579.

It is now beyond question that the phrase "in Alaska" is not ambiguous and does not include the OCS. *See Amoco,* 107 S.Ct. at 1405. Thus, the *Gambell* court's asserted justification for referring to the legislative history is no longer present.

The territorial scope of aboriginal claims extinguished by ANCSA is set forth in § 4(b) and (c). These sections include the limiting phrase "in Alaska." Therefore, according to *Amoco,* it is presumed that ANCSA only settles claims within the precise boundaries of the State of Alaska, which does not include the OCS. The next step is to determine whether this presumption is rebutted by the language or structure of ANCSA as a whole, or the relationship of ANCSA to ANILCA and ASA.

Appellees primarily focus on four sections of ANCSA. Section 4(b) reads as follows:

> All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, *including* submerged land underneath all water areas, both inland and offshore, and *including* any aboriginal hunting or fishing rights that may exist, are hereby extinguished.

43 U.S.C. § 1603(b) (emphasis added). Appellees contend that this language applies to the OCS for three reasons. First, the phrase "including submerged land underneath all water areas, both inland and offshore" brings the OCS into Alaska for purposes of ANCSA. Second, the phrase, "including any aboriginal hunting or fishing rights that may exist," exhibits the all inclusive nature of the extinguishment. Third, the phrase "in Alaska" refers to the location of the claimant rather than the location of the land.

As to the third contention, the appellees' construction is unreasonable. The provision speaks of "claims of aboriginal *title in Alaska.*" 43 U.S.C. § 1603(b) (emphasis added). An unstrained reading of the subsection reveals that in order for a title to be extinguished, it is the location of the title or claimed title in Alaska, and not the residence in Alaska of the owner or claimant of the title, that is determinative.

The first two contentions have more substance, but are unacceptable for another reason. The phrase "in Alaska" or "public lands" (which is defined as "all Federal lands and interests therein located in Alaska," 43 U.S.C. § 1602(e)) appears throughout ANCSA. *See, e.g.,* 43 U.S.C. §§ 1602(c), (d), (e), 1603(a), (b), (c), 1610(a), 1611. The Supreme Court has stated that it is "inconceivable" that the phrases as used in §§ 1610(a) and 1611 (the land selection provisions) apply to the OCS. *Amoco,* 107 S.Ct. at 1408. We find no indication that Congress intended the same phrase to describe a vastly different territory in § 1603(b) and (c) (the claim settlement provisions). *See Amoco,* 107 S.Ct. at 1406–07. The existence of such legislative intent is particularly doubtful given Congress' proven ability to highlight the OCS when it intends to do so. *See* 43 U.S.C. § 1608(i) ("The provisions of this section do not apply to mineral revenues received from the Outer Continental Shelf."). Therefore, Congress' use of the word "including" in the text of § 4(b) does not expand the scope of the claim settlement provisions to reach the OCS.

Section 4(c) of ANCSA reads as follows:

> All claims against the United States, the State, and all other persons that are *based on claims of aboriginal right, title, use or occupancy of land or water areas in Alaska,* or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, are hereby extinguished.

43 U.S.C. § 1603(c) (emphasis added). Appellees contend that the emphasized language of this subsection extinguishes aboriginal claims in the OCS because such claims are geographically "based on" claims of use and occupancy of Alaskan shores and territorial sea.

This is a tortured reading of § 4(c). As the Villages note, the far more reasonable construction of this subsection is that it was intended to extinguish *legal* claims to the titles that are extinguished in § 4(b). *See United States v. Atlantic Richfield*

*Co.*, 612 F.2d 1132, 1135–36 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). This construction is also clear from the balance of the language in the subsection, which lists various legal sources for claims against the named defendants. Because aboriginal claims in the OCS are not extinguished by § 4(b), they are not extinguished by § 4(c).

Section 2(a) and (b) read in pertinent part as follows:

(a) there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims;

(b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation....

43 U.S.C. § 1601(a), (b). Appellees contend that these broad statements of policy compel a broad interpretation of the extinguishment sections of ANCSA. Whereas we agree that ANCSA should be construed broadly, its broad statements of policy cannot override its specific provisions that are clearly worded to accomplish more narrow objectives.

In short, the language and structure of ANCSA reasonably do not call into question the otherwise precise meaning of the phrase "in Alaska" as it is employed to extinguish aboriginal rights. Nor is that precise meaning called into question by the relationship of ANCSA to other statutes. This inquiry was made in *Amoco* where the Supreme Court noted the similar language employed in the land selection provisions of ASA, ANCSA, and ANILCA. *Amoco*, 107 S.Ct. at 1407–08. The Court concluded that "[c]learly, the purpose of these provisions was to apportion the land within the boundaries of the State of Alaska." *Id.* at 1408. Viewed in this historical and practical context, the claim settlement provisions of ANCSA cannot be construed differently.

There is no reason to resort to legislative history for insight into the proper scope of the claim settlement provisions of ANCSA, as it is clear that those provisions do not extend beyond the geographical boundaries of the State of Alaska and do not extinguish aboriginal subsistence rights that may exist in the OCS. *See Fernandez v. Brock*, 840 F.2d 622, 632 (9th Cir.1988) (absent exceptional circumstances, "if we find the statutory language unambiguous, then we will not resort to the legislative history"). We so hold.

**E.   Extinguishment by OCSLA**

Finally, appellees argue that, in enacting OCSLA, Congress expressed its clear intent to extinguish or authorize the extinguishment of aboriginal subsistence rights in the OCS. This question was not addressed by the district court or by this court during the initial appeal. Consequently, we remand the question to the district court for its initial consideration.

**Conclusion**

Accordingly, the judgment of the district court is reversed, and the case is remanded. On remand, the district court must decide 1) whether the Villages in fact possess aboriginal subsistence rights in the OCS, 2) if the Villages do possess such rights, whether the drilling and other activities by the oil companies will interfere significantly with the Villages' exercise of those rights, and 3) whether OCSLA extinguishes aboriginal subsistence rights in the OCS as a matter of law. This panel retains jurisdiction over any further appeals in this action.

**REVERSED and REMANDED.**

WALLACE, Circuit Judge, concurring:

I join in all but part D of the opinion. I do not believe that the Supreme Court's directions on remand *require* us to reach the ANCSA issue. At the end of its opinion, the Court stated, "We do not decide here the scope of ANCSA § 4(b).... this question is remanded to the Court of Appeals for decision in light of this opinion." *Amoco Production Co. v. Village of Gambell*, 107 S.Ct. 1396, 1409 (1987). In my view, a "decision in light of this opinion" can be a remand of this issue to the district court. I think such a remand would be preferable. It may well be that the district court would decide the case on other grounds and never reach the ANCSA issue. Thus, part D is unnecessary to the resolution of this appeal and ultimately may be

unnecessary to the resolution of the entire case.

The Supreme Court was well aware that in our earlier opinion we reached the ANC-SA issue only because we *assumed* the existence of aboriginal rights. For this reason, its directions on remand can and should be read as expressing a certain amount of flexibility. The majority, however, reads these directions as *requiring* us to discuss and resolve the ANCSA issue. Suppose, however, that we had agreed with the district court that the aboriginal rights *had* been extinguished by the United States's external sovereignty? Would we have been required by the Supreme Court's directions to go on to discuss whether these extinguished rights were also extinguished by ANCSA? Of course not. Such a result would make no sense.

I would remand the ANCSA issue to the district court for initial consideration in light of the Supreme Court opinion.