**NATIVE VILLAGE OF EYAK; Native Village of Tatitlek; Native Village of Chanega (Aka Chenega); Native Village of Nanwalek; Native Village of Port Graham, Plaintiffs–Appellants,**

v.

**TRAWLER DIANE MARIE, INC.; William Daley, Secretary of Commerce, Defendants–Appellees.**

No. 97–35944.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1998.

Decided Sept. 9, 1998.

Laurence A. Aschenbrenner (argued), Heather R. Kendall–Miller, Martha L. King, Native American Rights Fund, Anchorage, Alaska, Carol E. Daniel, Anchorage, Alaska, William Caldwell, Alaska Legal Services Corporation, Fairbanks, Alaska, for appellants

Native Villages of Eyak, Tatitlek, Chanega, Nanwalek, Port Graham.

David C. Schilton (argued), Lois J. Schiffer, Robert L. Klarquist, Bruce M. Landon, U.S. Department of Justice, Washington, DC, for appellee William M. Daley, Secretary of Commerce.

Before: FARRIS, O'SCANNLAIN, and HAWKINS, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this case of first impression, we must consider Alaskan Native Village claims of aboriginal title, including exclusive hunting and fishing rights, to the outer continental shelf of the United States.

## I

The Alaskan Native Villages of Eyak, Tatitlek, Chanega, Port Graham, and Nanwalek (collectively, the "Native Villages") appeal the district court's summary judgment in favor of the Secretary of the United States Department of Commerce ("Secretary") in their action asserting unextinguished aboriginal title to a portion of the outer continental shelf ("OCS")[1] of the United States. According to the Native Villages, regulations promulgated by the Department of Commerce for the management of halibut and sablefish fisheries violate their rights to the exclusive use and occupancy of the OCS.

The Native Villages are located in the Prince William Sound, the Gulf of Alaska, and the lower Cook Inlet regions of Alaska. They claim that, for more than 7,000 years, their members have hunted sea mammals and harvested the fishery resources of the OCS. The Native Villages maintain that a majority of their members still maintain a subsistence lifestyle heavily reliant on the fish and wildlife of the OCS, and that their continued social, cultural, and economic well-being depends on their continued ability to hunt and to fish in their traditional territories on the OCS. The Native Villages argue that they are entitled to exclusive use and occupancy of their respective areas of the OCS, including exclusive hunting and fishing rights, based upon unextinguished aboriginal title.

The Secretary of Commerce[2] manages fisheries pursuant to the Magnuson Fishery Conservation Management Act ("Magnuson Act"), 16 U.S.C. §§ 1801–1882. The Magnuson Act extended the sovereign control and jurisdiction of the United States to waters lying between 3 and 200 miles off the coast of the United States by establishing an exclusive fishery conservation zone and asserting "sovereign rights and exclusive fishery management authority over all fish and all Continental Shelf fishery resources, within the exclusive economic zone." 16 U.S.C. § 1811. Pursuant to the Magnuson Act and the Northern Pacific Halibut Act of 1982 ("Halibut Act"), 16 U.S.C. §§ 773–773k, the Secretary promulgated regulations in 1993 limiting access to the sablefish and halibut fisheries in the Gulf of Alaska and the lower Cook Inlet. See 50 C.F.R. § 676. The Native Villages challenge the Secretary's fishing regulations on the ground that they improperly authorize non-tribal members to fish within the Native Villages' exclusive aboriginal territories while prohibiting Native Village members without Individual Fishing Quotas ("IFQ")[3] from doing the same. The

---

1. "[The OCS includes] all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of [the Submerged Lands Act], and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). The OCS includes those submerged lands outside state territorial boundaries (which in Alaska's case means beyond three miles) extending to the outer geologic edge of the continental shelf and within United States jurisdiction and control.

2. The only defendant remaining in this action is the Secretary of Commerce. The Native Villages' action against the Secretary of the Interior was dismissed for lack of ripeness and not appealed. The Native Villages' action against the Trawler Diane Marie, Inc., was dismissed pursuant to a stipulation of the parties.

3. Any boat that fishes commercially for sablefish or halibut in the regulated area must have an IFQ share permit issued by the Secretary specifying the individual fishing quota allowed for the vessel. See 50 C.F.R. § 676.13(a). The regulated area consists of portions of the Gulf of Alaska,

Native Villages have requested an injunction against the Secretary's fishing regulations and a declaration that they hold aboriginal title and exclusive aboriginal rights to use, occupy, possess, hunt, fish, and exploit the waters, and to the mineral resources within their traditional use areas of the OCS.

Both the Native Villages and the Secretary moved for summary judgment before the district court. Granting the Secretary's motion and denying the Native Villages' motion, the district court held: (1) that federal paramountcy precludes aboriginal title in the OCS and (2) that there is no exclusive aboriginal right to fish in navigable waters based on aboriginal title outside of a treaty or federal statute.[4] The Native Villages appeal.

## II

We first consider whether the district court erred in concluding that the federal paramountcy doctrine bars the Native Villages' aboriginal title claims to the OCS, including exclusive hunting and fishing rights.

## A

The "federal paramountcy doctrine" is derived, in essence, from four Supreme Court cases in which the federal government and various coastal states disputed ownership and control of the territorial sea and the adjacent portions of the OCS.

The first of these cases was *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), in which the United States sued to enjoin the State of California from executing leases authorizing the taking of petroleum, gas, and other mineral deposits from the Pacific Ocean. The United States argued that it owned in fee simple, or possessed "paramount rights" in, the lands, minerals, and "other things of value" underlying the ocean and sought a decree so declaring. *Id.* at 22, 67 S.Ct. 1658. In response, California contended that the area in question, which extended just three miles into the

ocean from the low-water mark off its coast, was within *its* boundaries. *See id.* California reasoned that, because the original thirteen states had acquired from the Crown of England title to all lands within their boundaries under navigable waters (including a three-mile belt in adjacent seas), and because California was admitted on an "equal footing" with the original states, it also became vested with title to these submerged lands upon entry into the Union. *See id.* at 23, 67 S.Ct. 1658.

The issue before the Supreme Court, then, was "whether the state or the Federal Government has the paramount right and power to determine in the first instance when, how, and by what agencies, foreign or domestic, the oil and other resources of the soil of the marginal sea, known or hereafter discovered may be exploited." *Id.* at 29, 67 S.Ct. 1658. Rejecting California's argument, the Court concluded that the acquisition of the three-mile belt, as well as its protection and control, has been and is a function of "national external sovereignty." *Id.* at 34, 67 S.Ct. 1658. The Court dismissed the idea that the "local interests" which support a state's dominion over its land-locked navigable waters in any way favor state control over any part of the ocean. *See id.* Instead, the Court decided, it is the federal government which "must have powers of dominion and regulation in the interest of its revenues, its health, and the security of its people from wars waged on or too near its coasts." *Id.* at 35, 67 S.Ct. 1658. Matters which occur in the open sea are questions for consideration among nations, not among their separate governmental units, which, under our constitutional system, are "not equipped ... with the powers or the facilities for exercising the responsibilities" accompanying dominion over the ocean. *Id.* Thus, the Court declared, "California is not the owner of the three-mile marginal belt along its coast." *Id.* at 38, 67 S.Ct. 1658. Instead, "the Federal Government rather than the state has paramount

---

*see* 50 C.F.R. § 676.10(b), encompassing the Native Villages' aboriginal hunting and fishing grounds. The Native Villages maintain that, although a few of their members possess IFQ permits, the vast majority do not.

**4.** The district court decided "only the aboriginal title issues, ... [and left] for another day the question of what nonexclusive fisheries rights, if any, plaintiffs might have in the OCS which are not dependent upon aboriginal title." We therefore express no opinion on this issue.

rights in and power over that belt, an incident to which is full dominion over the resources of the soil under that water area, including oil." *Id.* at 38–39, 67 S.Ct. 1658.

Bolstered by the favorable outcome in *California*, the United States brought similar actions to confirm its title to the seabed adjacent to other coastal states. In *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950), the United States brought suit against the State of Louisiana, which argued that it held title to the seabed under the waters extending twenty-seven miles into the Gulf of Mexico. According to Louisiana, before and since the time of its admission to the Union, it had exercised dominion over the area in question and by state statute had even formally included the twenty-seven-mile belt within its boundaries. *See id.* at 701, 70 S.Ct. 914. The Supreme Court disagreed. Finding *California* controlling, the Court held:

> Protection and control of the area are indeed functions of national external sovereignty. The marginal sea is a national, not a state concern. *National interests, national responsibilities, national concerns are involved. The problems of commerce, national defense, relations with other powers, war and peace focus there. National rights must therefore be paramount in that area.*

*Id.* at 704, 70 S.Ct. 914 (citations omitted) (emphasis added).

The Court found that the only difference between the argument raised by Louisiana and the one raised by California was that Louisiana's claimed boundary extended twenty-four miles beyond California's three-mile claim. *See id.* at 705, 70 S.Ct. 914. This difference did not weigh in Louisiana's favor, however:

> If ... the three-mile belt is in the domain of the Nation rather than that of the separate States, it follows *a fortiori* that the ocean beyond that limit also is. *The ocean seaward of the marginal belt is perhaps even more directly related to the national defense, the conduct of foreign affairs, and world commerce than is the marginal sea. Certainly it is not less so.* So far as the issues presented here are concerned, Louisiana's enlargement of her boundary emphasizes the strength of the claim of the

United States to this part of the ocean and the resources of the soil under that area, including oil.

*Id.* at 705–06, 70 S.Ct. 914 (emphasis added).

In the companion case to *Louisiana*, *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950), the Supreme Court again reaffirmed its holding in *California*. The State of Texas had, by statute, extended its boundary first to a line twenty-four miles beyond the three-mile limit, and thereafter to the outer edge of the continental shelf. *See Texas*, 339 U.S. at 720, 70 S.Ct. 918. Texas raised a somewhat different argument than had either California or Louisiana, one more analogous to that asserted by the Villages here. Texas argued that, because it was a separate republic prior to its entry into the United States, it had both dominium (ownership or proprietary rights) and imperium (governmental powers of regulation and control) with respect to the lands, minerals, and other products underlying the marginal sea. *See id.* at 712, 70 S.Ct. 918. Upon entering the Union, Texas transferred to the federal government its powers of sovereignty—its imperium—over the marginal sea, but retained its dominium. *See id.* at 713, 70 S.Ct. 918.

The Supreme Court was not persuaded. While the *Republic* of Texas may have had complete sovereignty and ownership over the marginal sea and all things of value derived therefrom, the *State* of Texas did not. *See Texas*, 339 U.S. at 717, 70 S.Ct. 918. "When Texas came into the Union, she ceased to be an independent nation.... The United States then took her place as respects foreign commerce, the waging of war, the making of treaties, defense of the shores, and the like." *Id.* at 717–718, 70 S.Ct. 918. As an incident to the transfer of that sovereignty, any "claim that Texas may have had to the marginal sea was relinquished to the United States." *Id.* at 718, 70 S.Ct. 918. The Court recognized that "dominion and imperium are normally separable and separate"; however, in this instance, "property interests are so subordinated to the rights of sovereignty as to follow sovereignty." *Id.* at 719, 70 S.Ct. 918. The Court rejected the argument that "the sovereignty of the sea can be complete

and unimpaired no matter if Texas owns the oil underlying it," concluding that "once low-water mark is passed the international domain is reached." *Id.* At that point, "[p]roperty rights must ... be so subordinated to political rights as in substance to coalesce and unite in the national sovereign." *Id.* The Court reasoned: "Today the controversy is over oil. Tomorrow it may be over some other substance or mineral or perhaps the bed of the ocean itself. If the property, whatever it may be, lies seaward of low-water mark, *its use, disposition, management, and control involve national interests and national responsibilities.*" *Id.* (emphasis added).

In the last of the paramountcy cases, *United States v. Maine*, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975), the United States brought an action against the thirteen Atlantic Coastal States asserting that the federal government was entitled to exercise sovereign rights over the seabed and subsoil underlying the Atlantic Ocean to the exclusion of the coastal states for the purpose of exploring the area and exploiting its natural resources. *See id.* at 516–517, 95 S.Ct. 1155. The area in dispute included the ocean lying more than three miles seaward from the ordinary low-water mark and from the outer limit of inland waters on the coast extending seaward to the outer edge of the continental shelf. The coastal states, with the exception of Florida, claimed that, as successors in title to certain grantees of the Crown of England (or the Crown of Holland, in New York's case), they were entitled to the exclusive right of dominion and control over the seabed underlying the Atlantic Ocean seaward from its coastline to the limits of the jurisdiction of the United States. *See id.* at 517–518, 95 S.Ct. 1155. The coastal states maintained that "they acquired dominion over the offshore seabed prior to the adoption of the Constitution and at no time relinquished it to the United States." *Id.* at 519, 95 S.Ct. 1155.

At the urging of the coastal states, the Supreme Court reexamined the decisions in *California, Louisiana,* and *Texas.* To the states' dismay, the Court concluded that these cases remained grounded on sound constitutional principles. *See id.* at 524, 95 S.Ct. 1155. Whatever interest the states may have held in the sea prior to statehood, the Court held, as a matter of "purely legal principle ... the Constitution ... allotted to the federal government jurisdiction over foreign commerce, foreign affairs, and national defense and ... it necessarily follows, as a matter of constitutional law, that as attributes of these external sovereign powers the federal government has paramount rights in the marginal sea." *Id.* at 522–523, 95 S.Ct. 1155 (citation and internal quotation marks omitted). The fact that the original thirteen states existed prior to the formulation of the Union again proved to be of no constitutional importance. *See id.* at 523, 95 S.Ct. 1155 (citing *Texas,* 339 U.S. at 717, 70 S.Ct. 918). Accordingly, judgment was entered in favor of the United States. *See id.* at 528, 70 S.Ct. 918.[5]

### B

We turn now to the specific issue presented here: whether the federal paramountcy doctrine serves to bar not only state claims to the OCS, but also claims made by persons and entities indigenous to these lands, in this case, the Native Villages.

### 1

The district court reasoned that, if the states have no property rights in the OCS via the paramountcy doctrine, *a fortiori,* it cannot be otherwise for a tribal entity which, even if possessed of sovereign rights, is dependent upon the United States in the same manner as a state with regard to, *inter alia,* national defense, foreign affairs, and world commerce. Even though Indian tribes existed and governed North America before the United States came into existence, the same is true of the original states. Nevertheless, this did not prevent the Supreme Court from

---

5. In addition, the Supreme Court held that the rule that paramount rights to the offshore seabed inhere in the federal government as an incident of national sovereignty was *confirmed* by Congress in both the Submerged Lands Act of 1953 ("SLA"), which granted the individual states title to submerged lands lying three miles off their coasts, and the Outer Continental Shelf Lands Act of 1953, which the Court noted was a congressional reaffirmation of federal control over the OCS extending seaward of the three-mile limit. *See id.* at 524–528.

deciding that the states had no property or sovereign claims to the OCS. The district court thus found the claims of the Native Villages to be inconsistent with the sovereignty of the federal government in the OCS as expressed in the paramountcy cases.

The Native Villages argue that the district court erred in so concluding. They contend that the district court based its decision on an erroneous legal premise, namely, that their claims of aboriginal title are the legal equivalent of the states' claims of fee title and sovereignty. In fact, the Native Villages contend, the "legal, fee, or sovereign title" claimed by the states and aboriginal title are two very different property claims. According to the Native Villages, aboriginal title is not legal title or even a property right at all. Aboriginal title, according to the Native Villages, "*presumes* federal paramountcy" and bestows only the exclusive right to use and to occupy territory to which the federal government admittedly holds sovereign title, until Congress provides otherwise. Consequently, the Native Villages contend, their claim does not conflict with the federal government's paramount interests in the OCS.

In support of their argument, the Villages point to *Village of Gambell v. Hodel,* 869 F.2d 1273 (9th Cir.1989), in which we noted that "aboriginal rights may exist concurrently with a paramount federal interest, without undermining that interest." *Id.* at 1277. The Villages assert that *Gambell* and the cases cited therein, including *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 233–36, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985), *Cramer v. United States,* 261 U.S. 219, 227, 43 S.Ct. 342, 67 L.Ed. 622 (1923), and *Johnson v. M'Intosh,* 21 U.S. (8 Wheat) 543, 5 L.Ed. 681 (1823), stand for the proposition that native tribes have an "unquestioned right ... to the exclusive possession of their lands." They claim that to accept the district court's conclusion that aboriginal title in the OCS is precluded based on "nothing more than its potential effect on the government's power over national defense and international commerce," would violate the fundamental principle of federal Indian law, *i.e.,* "that federal sovereignty is subject to the Indians' right of occupancy," unless and until extinguished by Congress.

**2**

As an initial matter, we caution the Native Villages not to read too much into our statement in *Gambell* that aboriginal rights may coexist with the federal government's paramount interests in the OCS. *See Gambell,* 869 F.2d at 1277. As we made clear in that case, only *limited* assertions of aboriginal subsistence rights were contemplated; *exclusive* rights to use or occupy areas of the ocean were never considered. Specifically, in our remand order, we directed the district court to determine, *inter alia,* "(1) whether the Villages in fact possess aboriginal subsistence rights in the OCS [and] (2) if the Villages do possess such rights, whether the drilling and other activities by the oil companies will *interfere significantly* with the Villages' exercise of those rights." *Id.* at 1280 (emphasis added). Plainly, if we had considered that the Villages could hold *exclusive* rights to the OCS, we would not have remanded for a determination of whether the activities of third parties would "interfere significantly" with those rights. *Any* interference would have been enough to violate the Native Villages' exclusive rights. Therefore, *Gambell* at most provides some guidance here; it is not controlling on this issue of first impression.

Having said that, we note the statement in *Gambell* that the paramountcy doctrine is *not* limited merely to disputes between the national and state governments. *See Gambell,* 869 F.2d at 1276; *see also Inupiat Community of the Arctic Slope v. United States,* 548 F.Supp. 182 (D.Alaska 1982), *aff'd,* 746 F.2d 570 (9th Cir.1984). Any claim of sovereign right or title over the ocean by any party other than the United States, including Indian tribes, is equally repugnant to the principles established in the paramountcy cases. *See id.*

This case presents a markedly different situation from the one we considered in *Gambell.* The Native Villages here assert *exclusive* rights of use and occupancy, not limited rights. Although they assure us that their claims to the OCS are "subordinate" to federal sovereignty, in that aboriginal title "presumes" federal paramountcy in the OCS, we are hard pressed to see a practical differ-

ence between the relief sought by the Native Villages and that sought by the states in the paramountcy cases. The Native Villages pray for a declaration that they "hold aboriginal title and *exclusive* aboriginal rights to use, occupy, possess, hunt, fish, and exploit the waters, and mineral resources within their traditional use areas of the OCS in Prince William Sound, the Gulf of Alaska, and Cook Inlet." They seek *exclusive* use of the ocean resources and regulatory power over third parties, including officials of our executive branch of government, subject only to the laws of Congress. We fail to see how this differs from the claims asserted by the states. Simply saying that a claim of aboriginal title is less intrusive than a claim of fee title does not make it so.

Further, the Native Villages' purported concession that they "do not dispute Congress's ultimate power to enact laws authorizing non-tribal members to fish within their aboriginal fishing grounds" is really no concession at all. The Supremacy Clause of the Constitution inherently requires the same of states; yet this truism did not save the states' claims to the OCS. And it does not save the Native Villages' claims here. Before the Supreme Court, the State of Texas raised a similar argument, contending that there could be "joint" ownership or control over the OCS. According to Texas, the federal government could hold complete and unimpaired sovereignty over the sea while Texas owned the resources lying beneath it. *See Texas*, 339 U.S. at 719, 70 S.Ct. 918. The Court was not persuaded. It held that— whereas ownership or proprietary rights in property can be, and usually are, separated from the governmental powers of regulation and control—when dealing with the ocean, "[p]roperty rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign." *Id.* As the Court noted prophetically, "[t]oday the controversy is over oil. Tomorrow it may be over some other substance or mineral or perhaps the bed of the ocean itself." *Id.* Or, as we see here, it may be over fishing and hunting rights. This is why the Supreme Court held, "[i]f the property, whatever it may be, lies seaward of the low-water mark, its use, disposition, management, and control involve *national* interests and *na-*

*tional* responsibilities." *Id.* (emphasis added). No exception was made for Indian tribes, which, like states, are subordinate to the federal government, and hence, cannot "claim rights which are ... entrusted to the one external sovereign recognized by the Constitution." *Inupiat*, 548 F.Supp. at 187. We agree that, "[i]f, as a matter of constitutional law, the federal government must be possessed of paramount rights in offshore waters, it makes no difference whether the competing domestic claimant is a state or tribe of American natives." *Id.* We simply have no power to split the rights in the OCS as the Native Villages would like.

Finally, we reject the argument that the Native Villages are entitled to exclusive use of the OCS because they have hunted and fished in the sea for thousands of years prior to the founding of the United States. While we respect the history of the Native Villages and appreciate the importance of the OCS to them, the Supreme Court was likewise cognizant of the history of the coastal states in *California, Louisiana, Texas* and *Maine*. This did not, however, convince the Court to put the ocean and its resources at the disposal of the states. Whatever interests the states might have had in the OCS and marginal sea prior to statehood were lost upon ascension to the Union. *See Maine*, 420 U.S. at 522, 95 S.Ct. 1155; *Louisiana*, 339 U.S. at 704, 70 S.Ct. 914; *Texas*, 339 U.S. at 717, 70 S.Ct. 918; *California*, 332 U.S. at 34–35, 67 S.Ct. 1658. The Constitution allotted to the federal government jurisdiction over foreign commerce, foreign affairs, and national defense so that as attributes of these external sovereign powers, it has paramount rights in the contested areas of the sea. *See Maine*, 420 U.S. at 522, 95 S.Ct. 1155; *Louisiana*, 339 U.S. at 704, 70 S.Ct. 914; *Texas*, 339 U.S. at 717, 70 S.Ct. 918; *California*, 332 U.S. at 38, 67 S.Ct. 1658. This principle applies with equal force to *all* entities claiming rights to the ocean: whether they be the Native Villages, the State of Oregon, or the Township of Parsippany. "National interests, national responsibilities, national concerns are involved" in all these cases. *Louisiana*, 339 U.S. at 704, 70 S.Ct. 914. The Native Villages' claim to complete control over the OCS is contrary to these national

interests and inconsistent with their position as a subordinate entity within our constitutional scheme. *See Inupiat,* 548 F.Supp. at 187 (citing *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), for the proposition that Indian tribes are "dependent ... within our territorial jurisdiction" and have no "freedom to determine external relations."). We therefore hold that the Native Villages are barred from asserting exclusive rights to the use and occupancy of the OCS based on unextinguished aboriginal title.

## III

For the foregoing reasons, we conclude that the district court did not err in holding that the Native Villages' claims to the OCS are barred by the federal paramountcy doctrine.[6]

**AFFIRMED.**

---

**6.** Because we so hold, we need not reach the district court's alternative holding that common law property precepts preclude tribes from possessing exclusive hunting or fishing rights in navigable waters absent a treaty or statute. We have ruled on this issue previously in *Wahkiakum Band of Chinook Indians v. Bateman,* 655 F.2d 176 (9th Cir.1981), however, in which we held that the Chinook Indians had no aboriginal fishing rights to the Columbia River. In *Wahkiakum,* we noted that "[a]n aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that aboriginal fishing rights were impliedly reserved to the Indians." *Id.* at 180 n. 12; *see also Confed. Tribes of Chehalis v. Washington,* 96 F.3d 334, 341 (9th Cir. 1996) (citing *Wahkiakum* for the same). We are aware of no cases holding to the contrary.

Similarly, we need not reach the issue of whether the Villages' challenges to the sablefish regulations promulgated under the Magnuson Fishery Conservation Management Act are barred by the statute of limitations.