PER CURIAM Opinion; Dissent by Judge W. FLETCHER.
OPINION
PER CURIAM:
The Alaskan Native Villages of Eyak, Tatitlek, Chenega, Nanwalek and Port *621 Graham (“Villages”) assert that, beginning thousands of years before European contact and continuing through modem times, their members fished, hunted and otherwise exploited portions of the Outer Continental Shelf (“OCS”) in the Gulf of Alaska. Based on this history, the Villages claim they possess non-exclusive aboriginal hunting and fishing rights in the areas of the OCS they’ve traditionally used.
The OCS fisheries are regulated by the Secretary of Commerce. In 1993, the Secretary promulgated regulations limiting access to the halibut and sablefish fisheries after a “race for fish” led to conservation and management problems. See 16 U.S.C. §§ 1801-83; 16 U.S.C. §§ 773-773k; 57 Fed.Reg. 57130, 57130-32 (Dec. 3, 1992); Alliance Against IFQS v. Brown, 84 F.3d 343, 344-45 (9th Cir.1996) (holding that Individual Fishing Quota regulations were a permissible exercise of agency authority to prevent fishery depletion). Prior to the regulations, there was no limit on the number of vessels that could engage in the commercial harvest of halibut or sablefish. Under the regulations, any boat fishing commercially for halibut or sablefish must have an Individual Fishing Quota (“IFQ”) permit that caps how many fish the vessel may take. 50 C.F.R. § 679.4(d)(1).
The Secretary allocated IFQs only to persons or entities that owned or leased vessels used to cateh halibut or sablefish, and who actually caught those fish, between 1988 and 1990. 50 C.F.R. § 679.40(a)(3)(i). As of 2003, however, the regulations allow Alaska Natives and other subsistence fishers to catch up to twenty halibut per person per day, and two halibut per person per day for sport fishing. 68 Fed.Reg. 18,145, 18,153 & 18,159(g)(2) (Apr. 15, 2003) (codified at 50 C.F.R. § 300.65(h) & 50 C.F.R. § 300.64(f)). The regulations don’t govern subsistence fishing of mature sablefish because sablefish live too deep to catch without commercial gear. If the Villages meet IFQ requirements, they can commercially fish for halibut and sablefish.
The Villages claim that the Secretary’s regulations fail to account for the Villages’ non-exclusive aboriginal hunting and fishing rights, without Congress’s consent in violation of the federal common law and the Indian Non-Intercourse Act, 25 U.S.C. § 177. The district court dismissed their complaint with prejudice. The Villages timely appealed.
At the heart of this dispute are the competing federal interests of honoring Native rights and preserving national fisheries. When this case was previously before us, we held that the Villages’ claim to exclusive rights to hunt and fish on the OCS was barred by federal paramountcy. Native Village of Eyak v. Trawler Diane Marie, Inc. (Eyak I), 154 F.3d 1090, 1096-97 (9th Cir.1998). The paramountcy doctrine, as applied here, stands for the proposition that the national government has a paramount interest in ocean waters and submerged lands below the low-water mark. See N. Mariana Islands v. United States, 399 F.3d 1057, 1060-61 (9th Cir.2005). But the Villages point to Village of Gambell v. Hodel (Gambell III), 869 F.2d 1273 (9th Cir.1989), where we held that “aboriginal rights may exist concurrently with a paramount federal interest.” Id. at 1277.
Gambell III holds that aboriginal rights and the doctrine of federal paramountcy can coexist, whereas Eyak I holds that the paramountcy doctrine trumps Native claims based on aboriginal title. We took this case en banc to resolve any conflict between Gambell III and Eyak I. See Eyak Native Village v. Daley, 364 F.3d 1057, 1057 (9th Cir.2004). But we do not reach that question because the Villages *622 have failed to demonstrate the existence of aboriginal rights in the claimed area.
We previously remanded to the district court for the limited purpose of determining “what aboriginal rights, if any, the villages have” on the OCS, and instructed the district court to “assume that the villages’ aboriginal rights, if any, have not been abrogated by the federal paramountcy doctrine or other federal law.” Eyak Native Village v. Daley, 375 F.3d 1218, 1219 (9th Cir.2004) (en banc).
After trial, the district court held that, given the facts it found, “no nonexclusive right to hunt and fish in the OCS has ever existed for any plaintiff village as a matter of federal Indian law....” The Villages challenge this ruling on the ground that the facts found by the district court were sufficient to establish aboriginal rights. The Villages also argue that the district court exceeded the remand order by concluding that their claims to aboriginal rights were “preempted by the Paramountcy Doctrine.” But this makes no difference to the outcome here because the Villages don’t challenge the district court’s factual findings, which are dispositive.
Even though the Villages don’t contest those findings, the dissent goes on a fishing expedition through the trial record and testimony to make its own factual findings. Dissent at 629-31. The district court considered the opinions of the experts called by the parties and “found the opinions of some of the experts more persuasive than those of others” when making its findings. It is inappropriate for the dissent to usurp the factfinder’s role and reweigh the evidence. See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857-58, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (“An appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court might give facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent.” (internal citation and quotation marks omitted)). We now determine only whether the facts found by the district eourt support the Villages’ claim to aboriginal rights.
Aboriginal rights don’t depend on a treaty or an act of Congress for their existence. See United States v. Santa Fe Pac. R.R., 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941). Rather, the Villages have the burden of proving “actual, exclusive, and continuous use and occupancy ‘for a long time’ ” of the claimed area. Sac & Fox Tribe of Indians of Okla. v. United States, 383 F.2d 991, 998 (Ct.Cl.1967). This use and occupancy requirement is measured “in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers.” Id.
Historically, the Court of Claims was charged with reviewing the decisions of the Indian Claims Commission, and it was statutorily limited to reviewing whether “the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law ... are valid and supported by the Commission’s findings of fact.” See Indian Claims Commission Act of 1946 § 20(b), 60 Stat. 1049, 1054, 25 U.S.C. § 70 et seq. (1976 ed.). We are not similarly bound. The district court concluded that the Villages were unable to prove aboriginal rights because they did not show by a preponderance of the evidence that they were in a position to occupy or exercise exclusive control of the claimed areas. See 2 McCormick on Evid, § 339 (6th ed.) (“[A] party who has the burden of persuasion of a fact must prove it ... on the general run of issues in civil cases ‘by a preponderance of the evi *623 dence.’ ”); see also Iowa Tribe v. United States, 22 Ind. Cl. Comm. 232, 237-38 (1969) (“To establish Indian title under the Indian Claims Commission Act, the Iowa plaintiffs and the Sac and Fox plaintiffs each must prove by a preponderance of the evidence that their forebearers had actual exclusive and continuous use and occupancy of their respectively claimed areas for a ‘long time’ [prior to the loss of the property].”). We adopt the district court’s uncontested factual findings and conclude that the Villages have failed to prove their entitlement to aboriginal rights on the OCS.
The “difficulty of obtaining the essential proof necessary to establish Indian title” during ancient times requires the court to adopt a “liberal approach” in weighing evidence regarding aboriginal title claims. Nooksack Tribe of Indians v. United States, 3 Ind. Cl. Comm. 492, 499 (1955). Nevertheless, we conclude that the district court properly found that the Villages failed to show, by a preponderance of the evidence, that they exclusively used the claimed areas.
The district court found that the Villages “made irregular use of the OCS,” and that “[s]uch use and occupancy as probably existed was temporary and seasonal.” The Secretary argues that the Villages’ use of the OCS was “too sporadic” to support a claim for aboriginal rights. This “use and occupancy” requirement is measured in accordance with the “way of life, habits, customs and usages of the Indians who are its users and occupiers.” Sac & Fox Tribe of Indians of Okla., 383 F.2d at 998. Because the district court determined that the ancestral residents of the Villages “found their sustenance largely in marine waters,” and were “skilled marine hunters and fishermen,” we analyze their use of the OCS in accordance with their way of life as marine hunters and fishermen. See Confed. Tribes of the Warm Springs Reservation of Or. v. United States, 177 Ct.Cl. 184, 194 (1966).
There’s evidence that the Villages’ ancestors traveled to Middleton Island, the Barren Islands, Cook Inlet, the Copper River Delta and Wessels Reef to hunt and fish. When traveling between Kodiak and the Middleton Islands, their ancestors traversed portions of the OCS and engaged in opportunistic fishing during the course of these travels. The 8600 record supports the finding that the Villages’ ancestors made seasonal use of “portions of the OCS nearest their respective villages and when traveling to the outlying islands.” Intermittent or seasonal use is sufficient to support aboriginal title because it’s consistent with the seasonal nature of the ancestors’ way of life as marine hunters and fishermen. See id. The Villages thus satisfy the “continuous use and occupancy” requirement.
But the Villages haven’t proven exclusivity. Exclusivity is established when a tribe or a group shows that it used and occupied the land to the exclusion of other Indian groups. See United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1394 (Ct.Cl.1975). Use of the OCS alone isn’t sufficient to prove exclusive possession. See Osage Nation of Indians v. United States, 19 Ind. Cl. Comm. 447, 489 (1968), The tribe or group must exercise full dominion and control over the area, such that it “possesses the right to expel intruders,” id, as well as the power to do so. The district court properly found that the Villages failed to show by a preponderance of evidence that they exercised exclusive control, collectively or individually, over the areas of the OCS they now claim.
The Villages (and the dissent) argue that a lack of evidence that any other tribe hunted or fished in the claimed area is *624 enough to establish exclusive control. But the district court found that:
[S]ome of the OCS areas in question (in particular, the Lower Cook Inlet, the area between the Barren Islands and Kodiak Island, and the Copper River Delta and Copper River flats) were on the periphery of the [Villages’] territory. That is, the foregoing are the areas where the [Villages’ ancestors] met up with the Dena’ina, the Koniag, the pre-consolidation Eyak, and the Tlingit. More likely than not, these areas were fished and hunted on a seasonal basis by all of the Koniag, the Chugach, the Eyak, and the Tlingit. None of the ancestral villages was in a position to dominate or control Lower Cook Inlet, the high seas south of the Barren Islands, the waters of the OCS south of Prince William Sound and the Lower Kenai Peninsula, or waters of the OCS in the vicinity of the mouth of the Copper River. None of the ancestral villages was in a position to occupy or exercise exclusive control over any part of the OCS on a sustained basis.
A tribe must have “an exclusive and unchallenged claim to the disputed areas” to be entitled to aboriginal rights. Sac & Fox Tribe of Indians of Okla., 315 F.2d 896, 906 (Ct.Cl.1963). Areas that are continuously traversed by other tribes without permission of the claiming tribes cannot be deemed exclusive. See Wichita Indian Tribe v. United States, 696 F.2d 1378, 1385 (Fed.Cir.1983).
The dissent argues that there’s no evidence in the record to suggest that other tribes “inhabited, controlled or wandered over” the claimed area. Dissent at 631. But the district court found that other tribes fished and hunted on the periphery of the Villages’ claimed territory. Despite that finding, the dissent asserts, “In the case before us, there is no evidence of use or occupancy by other groups within Chu-gach territory.” Dissent at 632 (emphasis added). The dissent adopts an understanding of the word “periphery” that’s contrary to both common usage and the dictionary. Perhaps the most common use of the word “periphery” is in the phrase “peripheral vision.” What’s in your peripheral vision is what you can see, not what you can’t; the periphery is something at the limits of, but within, your vision. Here, as well, the “periphery” cited by the district court includes the outer boundary of the claimed area. The revered Webster’s Second defines “periphery” as, among other things, “the outward bounds of a thing as distinguished from its internal regions or center; encompassing limits; confines; borderland; as, only the periphery of Greenland has been explored.” Webster’s New International Dictionary 1822 (2d ed.1939). The dissent’s interpretation of “periphery” was outdated even in the 1930s when Webster’s Second was published. Id. (offering an alternate definition of “periphery” as a “[s]urrounding space; the area lying beyond the boundaries of a thing. Now Rare.”). Fish is best rare; language, not so much. As the district court clearly found, “some of the OCS areas in question” were exploited by other groups.
Even if the dissent were right, it wouldn’t change the outcome because the Villages still failed to present sufficient evidence of exclusivity. The district court found that the Villages’ claimed area was too large and there were too few people who could control it. The Villages’ low population, which was estimated to have been between 400 and 1500, suggests that the Villages were incapable of controlling any part of the OCS. See Osage Nation of Indians, 19 Ind. Cl. Comm, at 490 (finding the Osages didn’t have exclusive control given their low population and evidence *625 tending to prove that other parties used the claimed territory); Strong v. United States, 518 F.2d 556, 561 (Ct.Cl.1975) (“[0]ne of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed.”). The Villages claim that low population density can’t defeat exclusivity. See, e.g., Zuni Tribe of N.M. v. United States, 12 Cl.Ct. 607, 608 n. 2 (1987); United States v. Seminole Indians of the State of Fla., 180 Ct.Cl. 375, 385-86 (1967). But Zuni and Seminole held only that a low population density wasn’t enough to defeat aboriginal title, especially where there was other evidence that the tribes involved had dominion and control of their claimed lands. See, e.g., Zuni, 12 Cl.Ct. at 608 n. 2; Seminole, 180 Ct.Cl. at 383. Zuni and Seminole don’t foreclose reliance on population density where there is no evidence that the tribes exercised full dominion and control of the claimed area.
The Villages point to the occasional pitched battles involving numerous deaths between their members and other tribes, 8603 and to their “recogniftion] by the Russians as potentially formidable foes.” This falls far short of establishing exclusive control. See Confed. Tribes of the Warm Springs Reservation of Or., 177 Ct.Cl. at 196 (“The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.” (internal citation and quotation marks omitted)). The Villages failed to demonstrate that they controlled the claimed areas.
The district court found that “none of the ancestral villages was in a position to control or dominate access to any part of the OCS.” This finding is supported by the record. See Caddo Tribe of Okla. v. United States, 4 Ind. Cl. Comm. 214, 221 (1956) (finding no aboriginal title where the evidence demonstrated that the tribes were incapable of using, occupying and controlling their aboriginal claimed holdings). The district court found that “some hunting and fishing took place in the near parts of the OCS,” but the record also suggests that the Villages neither collectively nor individually controlled the OCS.
In addition, huge portions of the OCS being claimed were “seldom if ever visited.” The material factor is the “unity of land use and occupation—the collective use by the entire group of the entire area.” Hualapai Tribe v. United States, 18 Ind. Cl. Comm. 382, 394-95 (1967); Muekleshoot Tribe v. United States, 3 Ind. Cl. Comm. 669, 674-75 (1955) (recognizing aboriginal rights for autonomous villages where territories outside of their respective settlement areas were used “in common by the occupants of all the villages”). Contrary to the dissent’s assertion that the Villages found their sustenance in the same areas, Dissent at 636-37, the district court made it clear that the Villages did not use hunting and fishing areas in common: “It is unlikely that residents of the Kenai Peninsula coast fished or hunted Middleton Island, Wessels Reef, or the Copper River Delta. Similarly, it is unlikely that the Eyak fished or hunted in Cook Inlet. Likely there was no need to do so, and the travel would have been long and dangerous.” Moreover, the district court’s findings describe joint land-use as the “exception, not the norm” and there was “little or no evidence” to suggest joint-fishing on the OCS. See Hualapai, 18 Ind. Cl. Comm, at 394 (finding aboriginal title where a “group of Indians ... joined in a common use and occupation of a definable area”). The district court found that the Villages “used and occupied discrete ... land areas” with “separate ... hunting *626 and fishing access.” And there was no evidence of the sharing of fishing camps. Instead, the district court found that the Villages kept all, including each other, at arm’s length. The factual findings do not support a finding of collective use by the entire group of the entire area. More likely, each of the Villages stuck to its discrete area of the OCS.
There is not enough evidence in the record to persuade us that the Villages used and occupied the claimed areas to the exclusion of other tribes. Accordingly, we conclude that the Villages did not satisfy their burden of showing they exclusively controlled the claimed areas on the OCS.
[[Image here]]
Based on the uncontested factual findings of the district court, we affirm the district court’s conclusion that the Villages failed to establish an entitlement to nonexclusive aboriginal rights on the OCS. Because the Villages haven’t established aboriginal rights on the OCS, we have no occasion to consider whether there’s a conflict with the federal paramountcy doctrine. We also need not consider whether the Secretary’s actions violated the Indian Non-Intercourse Act.
AFFIRMED.