**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE VILLAGE OF EYAK; NATIVE
VILLAGE OF TATITLEK; NATIVE
VILLAGE OF CHENEGA; NATIVE
VILLAGE OF NANWALEK; NATIVE
VILLAGE OF PORT GRAHAM,
    *Plaintiffs-Appellants,*

    v.

REBECCA BLANK, Acting Secretary
of Commerce,
    *Defendant-Appellee.*

No. 09-35881

D.C. No.
3:98-cv-00365-HRH

OPINION

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, Senior District Judge, Presiding

Argued and Submitted
September 21, 2011—San Francisco, California

Filed July 31, 2012

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Harry Pregerson, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas,
William A. Fletcher, Richard A. Paez, Richard C. Tallman,
Johnnie B. Rawlinson, and Richard R. Clifton,
Circuit Judges.

Per Curiam Opinion;
Dissent by Judge W. Fletcher

## COUNSEL

Natalie A. Landreth (argued), Native American Rights Fund, Anchorage, Alaska; Goriune Dudukgian, Alaska Legal Services Corp., Anchorage, Alaska; Richard de Bobo, Robin Wechkin, Susan Acquista and Clive McClintock, Hogan & Hartson, LLP, Los Angeles, California, for the appellants.

Ignacio S. Moreno, Assistant Attorney General, Environment & Natl. Resources Div.; Brian McLachlan, E. Ann Peterson, David C. Shilton (argued), United States Department of Justice, Washington, D.C.; Demian C. Schane, NOAA Office of General Counsel, Juneau, Alaska, for the appellees.

---

**OPINION**

PER CURIAM:

The Alaskan Native Villages of Eyak, Tatitlek, Chenega, Nanwalek and Port Graham ("Villages") assert that, beginning thousands of years before European contact and continuing through modern times, their members fished, hunted and otherwise exploited portions of the Outer Continental Shelf ("OCS") in the Gulf of Alaska. Based on this history, the Villages claim they possess non-exclusive aboriginal hunting and fishing rights in the areas of the OCS they've traditionally used.

The OCS fisheries are regulated by the Secretary of Commerce. In 1993, the Secretary promulgated regulations limiting access to the halibut and sablefish fisheries after a "race for fish" led to conservation and management problems. *See* 16 U.S.C. §§ 1801-83; 16 U.S.C. §§ 773-773k; 57 Fed. Reg. 57130, 57130-32 (Dec. 3, 1992); *Alliance Against IFQS* v. *Brown*, 84 F.3d 343, 344-45 (9th Cir. 1996) (holding that Individual Fishing Quota regulations were a permissible exercise of agency authority to prevent fishery depletion). Prior to the regulations, there was no limit on the number of vessels that could engage in the commercial harvest of halibut or sablefish. Under the regulations, any boat fishing commercially for halibut or sablefish must have an Individual Fishing Quota ("IFQ") permit that caps how many fish the vessel may take. 50 C.F.R. § 679.4(d)(1).

The Secretary allocated IFQs only to persons or entities that owned or leased vessels used to catch halibut or sablefish, and who actually caught those fish, between 1988 and 1990. 50 C.F.R. § 679.40(a)(3)(i). As of 2003, however, the regulations allow Alaska Natives and other subsistence fishers to catch up to twenty halibut per person per day, and two halibut per person per day for sport fishing. 68 Fed. Reg. 18,145, 18,153 & 18,159(g)(2) (Apr. 15, 2003) (codified at 50 C.F.R. § 300.65(h) & 50 C.F.R. § 300.64(f)). The regulations don't govern subsistence fishing of mature sablefish because sablefish live too deep to catch without commercial gear. If the Villages meet IFQ requirements, they can commercially fish for halibut and sablefish.

The Villages claim that the Secretary's regulations fail to account for the Villages' non-exclusive aboriginal hunting and fishing rights, without Congress's consent in violation of the federal common law and the Indian Non-Intercourse Act, 25 U.S.C. § 177.  The district court dismissed their complaint with prejudice. The Villages timely appealed.

At the heart of this dispute are the competing federal interests of honoring Native rights and preserving national fisheries. When this case was previously before us, we held that the Villages' claim to *exclusive* rights to hunt and fish on the OCS was barred by federal paramountcy. *Native Village of Eyak* v. *Trawler Diane Marie, Inc.* (*Eyak I*), 154 F.3d 1090, 1096-97 (9th Cir. 1998). The paramountcy doctrine, as applied here, stands for the proposition that the national government has a paramount interest in ocean waters and submerged lands below the low-water mark. *See N. Mariana Islands* v. *United States*, 399 F.3d 1057, 1060-61 (9th Cir. 2005). But the Villages point to *Village of Gambell* v. *Hodel* (*Gambell III*), 869 F.2d 1273 (9th Cir. 1989), where we held that "aboriginal rights may exist concurrently with a paramount federal interest." *Id.* at 1277.

*Gambell III* holds that aboriginal rights and the doctrine of federal paramountcy can coexist, whereas *Eyak I* holds that

the paramountcy doctrine trumps Native claims based on aboriginal title. We took this case en banc to resolve any conflict between *Gambell III* and *Eyak I. See Eyak Native Village* v. *Daley*, 364 F.3d 1057, 1057 (9th Cir. 2004). But we do not reach that question because the Villages have failed to demonstrate the existence of aboriginal rights in the claimed area.

We previously remanded to the district court for the limited purpose of determining "what aboriginal rights, if any, the villages have" on the OCS, and instructed the district court to "assume that the villages' aboriginal rights, if any, have not been abrogated by the federal paramountcy doctrine or other federal law." *Eyak Native Village* v. *Daley*, 375 F.3d 1218, 1219 (9th Cir. 2004) (en banc).

After trial, the district court held that, given the facts it found, "no nonexclusive right to hunt and fish in the OCS has ever existed for any plaintiff village as a matter of federal Indian law . . . ." The Villages challenge this ruling on the ground that the facts found by the district court were sufficient to establish aboriginal rights. The Villages also argue that the district court exceeded the remand order by concluding that their claims to aboriginal rights were "preempted by the Paramountcy Doctrine." But this makes no difference to the outcome here because the Villages don't challenge the district court's factual findings, which are dispositive.

Even though the Villages don't contest those findings, the dissent goes on a fishing expedition through the trial record and testimony to make its own factual findings. Dissent at 8613-14. The district court considered the opinions of the experts called by the parties and "found the opinions of some of the experts more persuasive than those of others" when making its findings. It is inappropriate for the dissent to usurp the factfinder's role and reweigh the evidence. *See Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 857-58 ("An appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing

court might give facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." (internal citation and quotation marks omitted)). We now determine only whether the facts found by the district court support the Villages' claim to aboriginal rights.

**[1]** Aboriginal rights don't depend on a treaty or an act of Congress for their existence. *See United States* v. *Santa Fe Pac. R.R.*, 314 U.S. 339, 347 (1941). Rather, the Villages have the burden of proving "actual, exclusive, and continuous use and occupancy 'for a long time' " of the claimed area. *Sac & Fox Tribe of Indians of Okla.* v. *United States*, 383 F.2d 991, 998 (Ct. Cl. 1967). This use and occupancy requirement is measured "in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers." *Id.*

Historically, the Court of Claims was charged with reviewing the decisions of the Indian Claims Commission, and it was statutorily limited to reviewing whether "the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law . . . are valid and supported by the Commission's findings of fact." *See* Indian Claims Commission Act of 1946 § 20(b), 60 Stat. 1049, 1054, 25 U.S.C. § 70 *et seq.* (1976 ed.). We are not similarly bound. The district court concluded that the Villages were unable to prove aboriginal rights because they did not show by a preponderance of the evidence that they were in a position to occupy or exercise exclusive control of the claimed areas. *See* 2 McCormick on Evid. § 339 (6th ed.) ("[A] party who has the burden of persuasion of a fact must prove it . . . on the general run of issues in civil cases 'by a preponderance of the evidence.' "); *see also Iowa Tribe* v. *United States*, 22 Ind. Cl. Comm. 232, 237-38 (1969) ("To establish Indian title under the Indian Claims Commission Act, the Iowa plaintiffs and the Sac and Fox plaintiffs each must prove by a preponderance of the evi-

dence that their forebearers had actual exclusive and continuous use and occupancy of their respectively claimed areas for a 'long time' [prior to the loss of the property].”). We adopt the district court's uncontested factual findings and conclude that the Villages have failed to prove their entitlement to aboriginal rights on the OCS.

The “difficulty of obtaining the essential proof necessary to establish Indian title” during ancient times requires the court to adopt a “liberal approach” in weighing evidence regarding aboriginal title claims. *Nooksack Tribe of Indians* v. *United States*, 3 Ind. Cl. Comm. 492, 499 (1955). Nevertheless, we conclude that the district court properly found that the Villages failed to show, by a preponderance of the evidence, that they exclusively used the claimed areas.

**[2]** The district court found that the Villages “made irregular use of the OCS,” and that “[s]uch use and occupancy as probably existed was temporary and seasonal.” The Secretary argues that the Villages' use of the OCS was “too sporadic” to support a claim for aboriginal rights. This “use and occupancy” requirement is measured in accordance with the “way of life, habits, customs and usages of the Indians who are its users and occupiers.” *Sac & Fox Tribe of Indians of Okla.*, 383 F.2d at 998. Because the district court determined that the ancestral residents of the Villages “found their sustenance largely in marine waters,” and were “skilled marine hunters and fishermen,” we analyze their use of the OCS in accordance with their way of life as marine hunters and fishermen. *See Confed. Tribes of the Warm Springs Reservation of Or.* v. *United States*, 177 Ct. Cl. 184, 194 (1966).

**[3]** There's evidence that the Villages' ancestors traveled to Middleton Island, the Barren Islands, Cook Inlet, the Copper River Delta and Wessels Reef to hunt and fish. When traveling between Kodiak and the Middleton Islands, their ancestors traversed portions of the OCS and engaged in opportunistic fishing during the course of these travels. The

record supports the finding that the Villages' ancestors made seasonal use of "portions of the OCS nearest their respective villages and when traveling to the outlying islands." Intermittent or seasonal use is sufficient to support aboriginal title because it's consistent with the seasonal nature of the ancestors' way of life as marine hunters and fishermen. *See id.* The Villages thus satisfy the "continuous use and occupancy" requirement.

**[4]** But the Villages haven't proven exclusivity. Exclusivity is established when a tribe or a group shows that it used and occupied the land to the *exclusion* of other Indian groups. *See United States* v. *Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975). Use of the OCS alone isn't sufficient to prove exclusive possession. *See Osage Nation of Indians* v. *United States*, 19 Ind. Cl. Comm. 447, 489 (1968). The tribe or group must exercise full dominion and control over the area, such that it "possesses the right to expel intruders," *id.*, as well as the power to do so. The district court properly found that the Villages failed to show by a preponderance of evidence that they exercised exclusive control, collectively or individually, over the areas of the OCS they now claim.

The Villages (and the dissent) argue that a lack of evidence that any other tribe hunted or fished in the claimed area is enough to establish exclusive control. But the district court found that:

> [S]ome of the OCS areas in question (in particular, the Lower Cook Inlet, the area between the Barren Islands and Kodiak Island, and the Copper River Delta and Copper River flats) were on the periphery of the [Villages'] territory. That is, the foregoing are the areas where the [Villages' ancestors] met up with the Dena'ina, the Koniag, the pre-consolidation Eyak, and the Tlingit. More likely than not, these areas were fished and hunted on a seasonal basis by all of the Koniag, the Chugach, the Eyak, and the

Tlingit. None of the ancestral villages was in a position to dominate or control Lower Cook Inlet, the high seas south of the Barren Islands, the waters of the OCS south of Prince William Sound and the Lower Kenai Peninsula, or waters of the OCS in the vicinity of the mouth of the Copper River. None of the ancestral villages was in a position to occupy or exercise exclusive control over any part of the OCS on a sustained basis.

[5] A tribe must have "an exclusive and unchallenged claim to the disputed areas" to be entitled to aboriginal rights. *Sac & Fox Tribe of Indians of Okla.*, 315 F.2d 896, 906 (Ct. Cl. 1963). Areas that are continuously traversed by other tribes without permission of the claiming tribes cannot be deemed exclusive. *See Wichita Indian Tribe* v. *United States*, 696 F.2d 1378, 1385 (Fed. Cir. 1983).

[6] The dissent argues that there's no evidence in the record to suggest that other tribes "inhabited, controlled or wandered over" the claimed area. Dissent at 8616. But the district court found that other tribes fished and hunted on the periphery of the Villages' claimed territory. Despite that finding, the dissent asserts, "In the case before us, there is no evidence of use or occupancy by other groups *within* Chugach territory." Dissent at 8616 (emphasis added). The dissent adopts an understanding of the word "periphery" that's contrary to both common usage and the dictionary. Perhaps the most common use of the word "periphery" is in the phrase "peripheral vision." What's in your peripheral vision is what you *can* see, not what you can't; the periphery is something at the limits of, but within, your vision. Here, as well, the "periphery" cited by the district court *includes* the outer boundary of the claimed area. The revered Webster's Second defines "periphery" as, among other things, "the outward bounds of a thing as distinguished from its internal regions or center; encompassing limits; confines; borderland; as, only the *periphery* of Greenland has been explored." *Webster's New*

*International Dictionary* 1822 (2d ed. 1939). The dissent's interpretation of "periphery" was outdated even in the 1930s when Webster's Second was published. *Id.* (offering an alternate definition of "periphery" as a "[s]urrounding space; the area lying beyond the boundaries of a thing. *Now Rare*."). Fish is best rare; language, not so much. As the district court clearly found, "some of the OCS areas in question" *were* exploited by other groups.

Even if the dissent were right, it wouldn't change the outcome because the Villages still failed to present sufficient evidence of exclusivity. The district court found that the Villages' claimed area was too large and there were too few people who could control it. The Villages' low population, which was estimated to have been between 400 and 1500, suggests that the Villages were incapable of controlling any part of the OCS. *See Osage Nation of Indians*, 19 Ind. Cl. Comm. at 490 (finding the Osages didn't have exclusive control given their low population and evidence tending to prove that other parties used the claimed territory); *Strong* v. *United States*, 518 F.2d 556, 561 (Ct. Cl. 1975) ("[O]ne of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed."). The Villages claim that low population density can't defeat exclusivity. *See, e.g.*, *Zuni Tribe of N.M.* v. *United States*, 12 Cl. Ct. 607, 608 n.2 (1987); *United States* v. *Seminole Indians of the State of Fla.*, 180 Ct. Cl. 375, 385-86 (1967). But *Zuni* and *Seminole* held only that a low population density wasn't enough to defeat aboriginal title, especially where there was other evidence that the tribes involved had dominion and control of their claimed lands. *See, e.g.*, *Zuni*, 12 Cl. Ct. at 608 n.2; *Seminole*, 180 Ct. Cl. at 383. *Zuni* and *Seminole* don't foreclose reliance on population density where there is no evidence that the tribes exercised full dominion and control of the claimed area.

The Villages point to the occasional pitched battles involving numerous deaths between their members and other tribes,

and to their "recogni[tion] by the Russians as potentially for-midable foes." This falls far short of establishing exclusive control. *See Confed. Tribes of the Warm Springs Reservation of Or.*, 177 Ct. Cl. at 196 ("The fact that there is evidence, considered of and by itself, to support the administrative deci-sion is not sufficient where there is opposing evidence so sub-stantial in character as to detract from its weight and render it less than substantial on the record as a whole." (internal citation and quotation marks omitted)). The Villages failed to demonstrate that they controlled the claimed areas.

The district court found that "none of the ancestral villages was in a position to control or dominate access to any part of the OCS." This finding is supported by the record. *See Caddo Tribe of Okla.* v. *United States*, 4 Ind. Cl. Comm. 214, 221 (1956) (finding no aboriginal title where the evidence demon-strated that the tribes were incapable of using, occupying and controlling their aboriginal claimed holdings). The district court found that "some hunting and fishing took place in the near parts of the OCS," but the record also suggests that the Villages neither collectively nor individually controlled the OCS.

In addition, huge portions of the OCS being claimed were "seldom if ever visited." The material factor is the "unity of land use and occupation—the collective use by the entire group of the entire area." *Hualapai Tribe* v. *United States*, 18 Ind. Cl. Comm. 382, 394-95 (1967); *Muckleshoot Tribe* v. *United States*, 3 Ind. Cl. Comm. 669, 674-75 (1955) (recog-nizing aboriginal rights for autonomous villages where territo-ries outside of their respective settlement areas were used "in common by the occupants of all the villages"). Contrary to the dissent's assertion that the Villages found their sustenance in the same areas, Dissent at 8625-26, the district court made it clear that the Villages did not use hunting and fishing areas in common: "It is unlikely that residents of the Kenai Penin-sula coast fished or hunted Middleton Island, Wessels Reef, or the Copper River Delta. Similarly, it is unlikely that the

Eyak fished or hunted in Cook Inlet. Likely there was no need to do so, and the travel would have been long and dangerous." Moreover, the district court's findings describe joint land-use as the "exception, not the norm" and there was "little or no evidence" to suggest joint-fishing on the OCS. *See Hualapai*, 18 Ind. Cl. Comm. at 394 (finding aboriginal title where a "group of Indians . . . *joined* in a common use and occupation of a definable area"). The district court found that the Villages "used and occupied discrete . . . land areas" with "separate . . . hunting and fishing access." And there was no evidence of the sharing of fishing camps. Instead, the district court found that the Villages kept all, including each other, at arm's length. The factual findings do not support a finding of collective use by the entire group of the entire area. More likely, each of the Villages stuck to its discrete area of the OCS.

**[7]** There is not enough evidence in the record to persuade us that the Villages used and occupied the claimed areas to the exclusion of other tribes. Accordingly, we conclude that the Villages did not satisfy their burden of showing they exclusively controlled the claimed areas on the OCS.

\* \* \*

**[8]** Based on the uncontested factual findings of the district court, we affirm the district court's conclusion that the Villages failed to establish an entitlement to non-exclusive aboriginal rights on the OCS. Because the Villages haven't established aboriginal rights on the OCS, we have no occasion to consider whether there's a conflict with the federal paramountcy doctrine. We also need not consider whether the Secretary's actions violated the Indian Non-Intercourse Act.

**AFFIRMED.**

W. FLETCHER, Circuit Judge, with whom PREGERSON, THOMAS, and RAWLINSON, Circuit Judges, join, and with whom HAWKINS, Circuit Judge, joins as to Part I, dissenting:

I respectfully dissent.

In an unsigned opinion, the majority concludes that Alaskan Native Villages of Eyak, Tatitlek, Chenega, Nanwalek, and Port Graham ("the Chugach") failed to establish aboriginal hunting and fishing rights on part of the Outer Continental Shelf ("OCS") in the Gulf of Alaska because they did not show exclusive use and occupancy of any part of the claimed area. In so doing, the majority misstates the law and misreads plain English.

I would hold, based on the district court's findings, that the Chugach have established aboriginal hunting and fishing rights in at least part of the claimed area of the OCS, and that these rights are consistent with federal paramountcy. I would reverse and remand with instructions to the district court to find, under the proper legal test, precisely where within the claimed area the Chugach have aboriginal rights.

## I.   Aboriginal Rights

The Chugach claim that they have the right to exercise nonexclusive hunting and fishing rights in part of the Gulf of Alaska south of Prince William Sound and the Kenai Peninsula, based on their exclusive use of their traditional hunting and fishing grounds prior to contact with Europeans. The Chugach seek an order requiring that the Secretary of Commerce revise the challenged Individual Fishing Quota ("IFQ") regulations to accommodate their aboriginal rights. They ask that the revised regulations provide one IFQ permit or its equivalent to each plaintiff Village. Whether the Chugach's aboriginal rights, if established, would require the Secretary to provide one IFQ or its equivalent per Village is not before

us. The only question now before us is whether the Chugach have aboriginal rights that the Secretary must accommodate in some fashion.

To establish aboriginal rights, the Chugach must demonstrate by a preponderance of the evidence "actual, exclusive, and continuous use and occupancy" of the claimed area for a long period of time before contact with Europeans. *Sac & Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967). I agree with the majority and the parties that the test articulated in *Sac & Fox* applies here.

When this case was previously before our en banc panel, we remanded to the district court for a determination whether the Chugach had aboriginal fishing rights in the claimed area of the OCS. *Eyak Native Village v. Daley*, 375 F.3d 1218, 1219 (9th Cir. 2004) (en banc). We instructed the district court to assume, for purposes of the limited remand, that the federal paramountcy doctrine did not abrogate the Chugach's aboriginal rights. *Id.* After taking evidence, the district court held that the Chugach hunted and fished in portions of the OCS before contact with Europeans, but that such activities "did not give rise" to a right to hunt and fish "different from or greater than the rights of all United States citizens." The district court did not apply the *Sac & Fox* test.

The Chugach contend, and I agree, that the facts found by the district court are sufficient to establish their aboriginal rights under the *Sac & Fox* test. Based on the district court's findings, I conclude that the Chugach have established aboriginal rights in at least part of the claimed area of the OCS. I would remand to the district court for a determination, under the proper legal test, of precisely where within the claimed area they have aboriginal rights.

### A.   Continuous Use and Occupancy

The majority concludes that the Chugach have satisfied the "continuous use and occupancy" requirement of the *Sac & Fox* test. I agree.

Continuous use and occupancy are measured in accordance with the "way of life, habits, customs and usages of the Indians who are its users and occupiers." *Sac & Fox*, 383 F.2d at 998. The district court found that the Chugach were "skilled marine hunters and fishermen" who "found their sustenance largely in marine waters." They were "knowledgeable of ocean currents" and "entirely capable" of traversing the OCS in their boats. The Chugach navigated to Middleton Island, the Barren Islands, Cook Inlet, the Copper River Delta, and Wessels Reef to hunt and fish. They crossed portions of the OCS when traveling between these locations and fished along the way.

The district court found that such use and occupancy was "temporary and seasonal." The Chugach's seasonal use qualifies as "continuous" given their way of life as marine hunters and fishermen. *See Confed. Tribes of the Warm Springs Reservation of Or. v. United States*, 1966 WL 8893, at *5 (Ct. Cl. 1966); *Spokane Tribe of Indians v. United States*, 1963 WL 8583, at *5 (Ct. Cl. 1963) ("[I]ntermittent or seasonal use has been accepted as showing Indian title." (collecting cases)).

### B.   Exclusive Use and Occupancy

The majority concludes that the Chugach have failed to satisfy the "exclusive . . . use and occupancy" requirement of the *Sac & Fox* test. I strongly disagree.

### 1.   Governing Law

To carry its burden in establishing aboriginal rights, a plaintiff tribe "must show that it used and occupied the [claimed area] to the exclusion of other Indian groups." *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975). Where there is no evidence of use or occupancy by others within the claimed area, the claimant tribe need only show its own use and occupancy. In such a case, a court "must conclude," without more, that the plaintiff tribe

used and occupied the area exclusively. *Zuni Tribe of N.M. v. United States*, 12 Cl. Ct. 607, 617-20 & nn.13-15 (1987); *see also Caddo Tribe of Okla. v. United States*, 35 Ind. Cl. Comm. 321, 358-60 (1975) (finding exclusivity where "[t]here is no evidence indicating that other tribes of Indians were using and occupying this [claimed] area at the same time").

Where there is evidence of use or occupancy by others within the claimed area, a claimant tribe must show that it had the ability to exclude those other groups, such that the use by the others was temporary or permissive. *See Alabama-Coushatta Tribe of Tex. v. United States*, 2000 WL 1013532, at *13 (Fed. Cl. 2000) ("where another tribe commonly uses the land with the claimant tribe, proof of the claimant tribe's dominance over the other tribe preserves its exclusive use of the land"). A tribe's exclusive use and occupancy "is called in question where the historical record of the region indicates that it was inhabited, controlled or wandered over by many tribes or groups." *Pueblo of San Ildefonso*, 513 F.2d at 1394; *see also Strong v. United States*, 518 F.2d 556, 561 (Ct. Cl. 1975) ("'Exclusiveness' becomes a problem to plaintiffs simply because the historical record . . . demonstrates clearly that . . . the area as a whole was 'inhabited, controlled or wandered over by many tribes or groups.'"). Evidence of use and occupancy by other groups "must be specific" to defeat a claim of exclusivity. *Alabama-Coushatta Tribe*, 2000 WL 1013532, at *17; *Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed. Cir. 1983).

Evidence of use by others at the periphery of the claimed territory does not defeat a tribe's exclusivity within the claimed area. *See Caddo Tribe*, 35 Ind. Cl. Comm. at 360-62 (finding exclusive use and occupancy of claimed area even though members of another tribe "were found on the western periphery of Caddo territory" during the relevant period); *Zuni*, 12 Cl. Ct. at 608 n.3 (finding exclusive use and occupancy of claimed area, despite evidence of use by another

tribe near shared borders, because "such boundaries are the limit of the Zuni claim area, with Zuni use and occupancy within its boundaries"). "[A] claimant tribe's non-exclusive use of one segment of the claim area is not automatically imputed to the whole claim area." *Alabama-Coushatta*, 2000 WL 1013532, at *14. In such circumstances, a court must conclude "that a claimant tribe had exclusive use of certain portions of the claim area, but failed to prove exclusive use of other portions." *Id.*; *see also Wichita*, 696 F.2d at 1385 ("While we agree with the trial judge that the Wichitas could not have had exclusive use of the greater part of the [claimed] hunting grounds in Kansas, Oklahoma, or Texas, we cannot affirm his holding that the Wichitas failed to establish exclusive use of any [portion] of the hunting grounds in Oklahoma and Texas."); *Muckleshoot Tribe v. United States*, 3 Ind. Cl. Comm. 669, 677 (1955) ("[C]laimant's ancestors did not exclusively use and occupy the [entire] area claimed in their petition . . . , however, they did use and occupy a part of the area claimed and based upon the record in this case the Commission feels that the occupancy of that part was exclusive.").

Because of the "difficulty of obtaining the essential proof necessary to establish Indian title," courts take a "liberal approach" in weighing the limited historical evidence regarding exclusive use and occupancy. *Nooksack Tribe of Indians v. United States*, 3 Ind. Cl. Comm. 492, 499 (1955); *see also Muckleshoot*, 3 Ind. Cl. Comm. at 677 (because "it is extremely difficult to establish facts after the lapse of time involved in matters of Indian litigation," courts must "take a common sense approach" when evaluating exclusivity); *Snake or Piute Indians v. United States*, 112 F. Supp. 543, 552 (Ct. Cl. 1953) (exclusivity "can only be *inferred*" because it is difficult to prove "as of a date too remote to admit of testimony of living witnesses").

In sum, the *Sac & Fox* test requires that the Chugach show that they used and occupied the claimed area exclusively. It does not require that the Chugach show that they could have

repelled hypothetical intruders from the area. In the absence of evidence of use by others, the case law requires only that the Chugach show that they were the only group that used and occupied the area.

### 2.    District Court Factual Findings

The factual findings of the district court establish that the Chugach used and occupied some areas exclusively, with no use or occupancy of those areas by others. The court found:

> At contact, Kodiak Island, the southwest corner of the Kenai Peninsula, and Prince William Sound were occupied by two major but distinct subgroups of ethnic Alutiiq people. One subgroup occupying Kodiak Island was recognized by themselves and by others as Koniag; the other subgroup, occupying Prince William Sound and the south and southwest coast of the Kenai Peninsula, was recognized by themselves and others as Chugach. . . .

> . . . The Chugach occupied at various pre-contact times probably five or six sites on the coast and islands of Prince William Sound and two or three sites on the south and southwest coastal areas of the Kenai Peninsula. . . .

> Anthropologists estimate the Chugach population of Prince William Sound and the Lower Kenai Peninsula at or about the time of contact at between 400 and 1,500 people. . . .

> . . . At contact, the indigenous people of Prince William Sound and the Lower Kenai Peninsula found their sustenance largely in marine waters, relying heavily on fish and sea mammals, and to a lesser degree upon land mammals.

. . . .

At contact, the occupants of the extant Chugach villages were skilled marine hunters and fishermen. With their kayaks and umiaks, plaintiffs' ancestors were entirely capable of navigating anywhere within Prince William Sound, to Prince William Sound from the Lower Kenai Peninsula, and from either of these areas to the Barren Islands, Kodiak Island, Middleton Island, Wessels Reef, and the Copper River flats. Residents of Prince William Sound and the Lower Kenai Peninsula periodically traveled to Kodiak Island for purposes of trading. Middleton Island was visited regularly, probably seasonally to take birds and bird eggs as well as marine resources in the waters surrounding the island. . . .

At and before contact, there was animosity between plaintiffs' predecessors and the Tlingit, but also to a lesser degree with the Koniag. There were occasional "pitched battles" involving numerous deaths between members of the Chugach villages and the Tlingit or Koniag. . . .

The Russians had virtually enslaved other Alutiiq people as well as the Koniag. . . . The Chugach were recognized by the Russians as potentially formidable foes, and apparently chose to work and trade with the Chugach rather than attempting to dominate them.

. . . .

While it is more likely true than not that residents of the ancestral villages made some use (probably seasonal) of the portions of the OCS nearest their respective villages and when traveling to the outlying islands, none of the ancestral villages was in a

position to control or dominate access to any part of the OCS. The area was too large; and the number of men of an age who would have been able to defend or control high seas marine areas were too few. Moreover, some of the OCS in question (in particular, the Lower Cook Inlet, the area between the Barren Islands and Kodiak Island, and the Copper River Delta and Copper River flats) were *on the periphery of the Chugach territory*. That is, the foregoing are the areas where the Chugach villagers met up with the Dena'ina, the Koniag, the pre-consolidation Eyak, and the Tlingit. More likely than not, these areas were fished and hunted on a seasonal basis by all of the Koniag, the Chugach, the Eyak, and the Tlingit.

(Emphasis added.)

Nowhere in the district court's twenty-seven-page order is there any finding that another group used or occupied some of the area claimed by the Chugach. The district court specifically found that "more likely than not" there was shared use "on the periphery of the Chugach territory," but it made no such finding about shared use *within* the Chugach territory.

The district court noted that the opinions of the parties' experts sometimes differed, but that the experts based their opinions on the same body of historical evidence. The court wrote:

[T]he experts on both sides rely substantially upon the same, non-testifying experts who provide the most authoritative analysis of the culture of Native Americans occupying the south and southwest coast of the Lower Kenai Peninsula and Prince William Sound. The testifying experts' opinions are based upon very little independent, new investigation of the culture of the people of Prince William Sound

and the Lower Kenai Peninsula at and before contact with Europeans. The seminal work as regards the pre-contact culture of the areas in question was done between 1930 and 1950 by Kaj Birket-Smith and Frederica de Laguna. It is the work and writings of these investigators which is to a large degree the basis for the opinions of the testifying experts and the findings of the court.

The Chugach's experts testified without contradiction that geographic features at the periphery of Chugach territory had place names in more than one native language, but that features within Chugach territory had place names in only the Chugach language. For example, the Barren Islands and Kayak Island, which are located at the western and eastern periphery of the claimed Chugach territory, had place names in the languages of the Koniag, Tlingit, and Chugach. By contrast, Seal Rocks, Wessels Reef, and Middleton Island, which are located within the claimed area, had place names in only the Chugach language (respectively: "Qikertarraak," or "two small islands"; "Pala'at Nuutqaat," or "boat reefs"; and "Qucuaq," the meaning of which has been lost).

Both parties' experts agreed that there is no evidence that other groups used or occupied Chugach territory. At trial, the Chugach introduced records of five eyewitness accounts from 18th-century explorers describing encounters with seafaring Chugach on the OCS more than three miles from shore. The Chugach's expert anthropologist, Matt Ganley, testified, "We don't see anybody else in the OCS when the first Russians come into that area. We don't see anybody else on Middleton Island. There's no mention of other groups, and from the descriptions that the people provided, these were clearly Chugach people." The Secretary's expert anthropologists gave similar testimony. Michael Yarborough and Christopher Wooley both testified that they were unaware of any evidence that groups other than the Chugach fished or hunted in the claimed area during the pre-contact period.

### 3.   Majority's Fundamental Mistakes

The unsigned majority opinion concludes that the Chugach have not shown exclusive use and occupancy within any part of the claimed area. Its conclusion is based on two fundamental mistakes. First, it misstates the applicable law. Second, it misreads the word "periphery." I take its two mistakes in turn.

### a.   Misstatements of Law

The majority's test for exclusivity is that a claimant must show not only that it was the only tribe or group that used and occupied the claimed area, but also that it had the power to exclude other groups. This is an incorrect statement of law. If there is no evidence of use or occupancy by another group, a claimant need only make the first showing — that it was the only tribe or group to use and occupy the area. In such a case, a showing of use and occupancy by a claimant tribe, without more, is enough. Only if there is evidence of use or occupancy by another tribe or group must the claimant show, in order to establish its own exclusive use and occupancy, that it had the power to exclude that tribe or group.

The majority writes:

> [T]he Villages haven't proven exclusivity. Exclusivity is established when a tribe or group shows that it used and occupied the land to the *exclusion* of other Indian groups. *See United States* v. *Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975). Use of the OCS alone isn't sufficient to prove exclusive possession. *See Osage Nation of Indians* v. *United States*, 19 Ind. Cl. Comm. 447, 489 (1968). The tribe or groups must exercise full dominion and control over the area, such that it "possesses the right to expel intruders," *id.*, as well as the power to do so. The district court properly found that the Villages failed to show by a preponderance of the evidence

that they exercised exclusive control, collectively or individually, over the areas of the OCS they now claim.

Maj. Op. at 8601 (emphasis in original).

The majority cites two cases, *San Idlefonso* and *Osage Nation*, in support of its statement of the law. Neither case supports the majority.

The relevant passage of *San Ildefonso* is:

Implicit in the concept of ownership of property is the right to exclude others. Generally speaking, a true owner of land exercises full dominion and control over it; a true owner possesses the right to expel intruders. In order for an Indian tribe to establish ownership of land by so-called Indian title, it must show that it used and occupied the land to the exclusion of other Indian groups. *True ownership of land is called in question where the historical record of the region indicates that it was inhabited, controlled or wandered over by many tribes and groups.*

513 F.2d at 1394 (emphasis added).

The italicized last sentence is key: Aboriginal title is "called in question" only when there is evidence that the claimed area was "inhabited, controlled or wandered over by many tribes and groups." *See also United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 345 (1941) (distinguishing between "territory occupied exclusively" and "lands wandered over by many tribes"). Where there is no evidence that the area was "inhabited, controlled or wandered over" by others, the exclusive ownership of the tribe using and occupying the land is not "called in question." In the case before us, there is no evidence of use or occupancy by other groups within Chugach territory.

The relevant passage of *Osage Nation* is:

> Petitioner's [*i.e.*, the Osage Nation's] evidence tends to show an aboriginal territory extending to the Red River on the south and the 100th meridian on the west. It is quite clear from the evidence of both parties that war parties and occasional hunting parties did travel that far, but that fact in itself does not mean that the Osage had exclusive possession of the territory. The best estimate of the Osage population from 1808 to 1825 is between five and six thousand. Petitioner would have us believe that with a population of that size the Osage were able to exclusively use and occupy this huge territory. While petitioner does bring forth some evidence tending to buttress this conclusion, *the defendant, on the other hand, produced historical evidence tending to prove that other war and hunting parties did tend to use parts of the territory claimed by petitioner.* Faced with conflicting evidence and expert opinion, and moreover with evidence which is at best vague and uncertain, the Commission holds that the preponderance of the evidence indicates that with a population of five to six thousand, of which about 1500 would be warriors, the Osages could not have exclusively controlled and occupied all of the territory claimed here.

19 Ind. Cl. Comm. at 489-90 (emphasis added). In *Osage Nation*, as in *San Ildefonso*, there was evidence of use by other tribes within part of the claimed territory. In that circumstance, the Osage Nation was required to show it had the ability to exclude those tribes from that part of the territory.

The Indian Claims Commission held that, notwithstanding its small population, the Osage Nation did establish "exclusive use and occupancy" of another part of the claimed territory. As to this part, there was "no substantial evidence that the area . . . was used by tribes other than the Osage." *Osage*

*Nation*, 19 Ind. Cl. Comm. at 492; *see also Zuni Tribe*, 12 Cl. Ct. at 617 & nn.13-15 (a court "must conclude" that the plaintiff tribe used and occupied the area exclusively "in the absence of any evidence of occupation by any other group"); *Caddo Tribe*, 35 Ind. Cl. Comm. at 358-60 (finding exclusivity where "[t]here is no evidence indicating that other tribes of Indians were using and occupying this [claimed] area at the same time"). The holding in *Osage Nation* is based on the uniform case law that, where there is no evidence of use by others, a claimant tribe establishes exclusivity over a given area simply by showing its own use and occupancy.

In the case before us, the district court made extensive findings of use and occupancy by the Chugach in the claimed area of the OCS. The district court found no use or occupancy by others in Chugach territory. Because the Chugach claim aboriginal rights only in areas where there is no evidence of use by others, it is sufficient to show exclusivity that they were the only tribe to use and occupy these areas.

### b.   Misreading of "Periphery"

To evade the established case law, the majority purports to misunderstand the word "periphery." As I recount above, the district court found:

> [S]ome of the OCS in question (in particular, the Lower Cook Inlet, the area between the Barren Islands and Kodiak Island, and the Copper River Delta and Copper River flats) were *on the periphery of the Chugach territory*. That is, the foregoing are the areas where the Chugach villagers met up with the Dena'ina, the Koniag, the pre-consolidation Eyak, and the Tlingit. More likely than not, these areas were fished and hunted on a seasonal basis by all of the Koniag, the Chugach, the Eyak, and the Tlingit.

(Emphasis added.)

The common meaning of "periphery" is "edge" or "boundary." The plain meaning of the district court's finding is that other groups used areas at the edge or boundary of Chugach territory. The district court made no finding that other groups used areas within Chugach territory.

The district court's usage of "periphery" is the standard usage in ordinary English. It is also the standard usage in the case law applying the test for establishing aboriginal rights. The cases clearly recognize a distinction between shared use on the periphery of a claimed territory and shared use inside the territory. *See, e.g.*, *Caddo Tribe*, 35 Ind. Cl. Comm. at 360-62 (referring to Caddo confederacies that "lived within the area of Caddo use and occupancy," as opposed to other tribes that were found "on the western boundary" or "on the western *periphery* of Caddo territory" (emphasis added)); *Hualapai Tribe v. United States*, 18 Ind. Cl. Comm. 382, 395 (1967) (finding exclusive use and occupancy, but declining to enlarge the area of aboriginal title to include "*peripheral* areas" that were "used and occupied at the same time by other neighboring Indians" (emphasis added)); *Zuni Tribe*, 12 Cl. Ct. at 608 n.3 (finding exclusive use of claimed area, despite evidence of use by another tribe near shared borders, because "such boundaries are the limit of the Zuni claim area, with Zuni use and occupancy within its boundaries").

The majority reads "periphery" to mean not only the edge, but also the interior, of a territory. The majority's misreading of the word transforms the district court's finding of use by others at the edge of the Chugach territory into a finding of use within that territory. The majority writes:

> The dissent adopts an understanding of the word "periphery" that's contrary to both common usage and the dictionary. Perhaps the most common use of the word "periphery" is in the phrase "peripheral

vision." What's in your peripheral vision is what you *can* see, not what you can't; the periphery is something at the limits of, but within, your vision. Here, as well, the "periphery" cited by the district court *includes* the outer boundary of the claimed area. The revered Webster's Second defines "periphery" as, among other things, "the outward bounds of a thing as distinguished from its internal regions or center; encompassing limits; confines; borderland; as, only the *periphery* of Greenland has been explored." *Webster's New International Dictionary* 1822 (2d ed. 1939). The dissent's interpretation of "periphery" was outdated even in the 1930s when Webster's Second was published. *Id.* (offering an alternate definition of "periphery" as a "[s]urrounding space; the area lying beyond the boundaries of a thing. *Now Rare*."). Fish is best rare; language, not so much. As the district court clearly found, "some of the OCS areas in question" *were* exploited by other groups.

Maj. Op. at 8602-03 (emphases in original).

The majority's misreading of "periphery" is baffling. I understand why the majority is misreading the word: If periphery is read, as it should be, to mean edge or boundary, a rationale for the majority's decision disappears. But I do not understand how the majority can, with a straight face, maintain that its reading is correct. Indeed, the majority quotes a Webster's definition of the word that squarely contradicts its reading. The plain meaning of the district court's finding that other groups likely used areas "on the periphery of the Chugach territory" is that they used areas on the edge or boundary of Chugach territory. The plain meaning is not that they used areas within Chugach territory.

### 4.    Summary

Based on the case law and the district court's factual findings, I would hold that the Chugach have established aborigi-

nal hunting and fishing rights within at least part of the claimed area of the OCS. There is no evidence, and no finding by the district court, that other groups hunted or fished within the territory used and occupied by the Chugach. Evidence of use or occupancy by other tribes or groups "must be specific" to defeat a claim of exclusivity. *Alabama-Coushatta Tribe*, 2000 WL 1013532, at *17; *Wichita Indian Tribe*, 696 F.2d at 1385. As in *Alabama-Coushatta Tribe*, "we do not even have evidence that is too general" to defeat the claim of exclusivity. 2000 WL 1013532, at *17. In the case before us, there is no evidence whatsoever of use or occupancy by others.

## II.   Federal Paramountcy

Because I conclude that the Chugach have established aboriginal hunting and fishing rights in at least part of the claimed area of the OCS, I would reach the question whether aboriginal rights are consistent with federal paramountcy.

The Supreme Court articulated the federal paramountcy doctrine in a series of cases involving disputes between coastal states and the federal government over ownership and control of ocean resources. The Court repeatedly held that the federal government's paramount interest in "foreign commerce, foreign affairs and national defense" required that its control over the seabed be paramount to that of the states, regardless of the circumstances in which a state joined the Union. *United States v. Maine*, 420 U.S. 515, 522 (1975); *United States v. Texas*, 339 U.S. 707, 718-19 (1950); *United States v. Louisiana*, 339 U.S. 699, 704 (1950); *United States v. California*, 332 U.S. 19, 38-39 (1947). The federal government could grant ownership or control to the states to the degree that it wished, but control of the seabed belonged, "in the first instance," to the federal government. *Maine*, 420 U.S. at 522; *California*, 332 U.S. at 29. The Court explained:

> The marginal sea is a national, not a state concern. National interests, national responsibilities, national

concerns are involved. The problems of commerce, national defense, relations with other powers, war and peace focus there. National rights must therefore be paramount in that area.

*Louisiana*, 339 U.S. at 704.

In *Village of Gambell v. Hodel* ("*Gambell III*"), 869 F.2d 1273, 1277 (9th Cir. 1989), we held that federal paramountcy was consistent with aboriginal rights on the OCS because such rights "may exist concurrently with a paramount federal interest, without undermining that interest." However, nine years later in *Native Village of Eyak v. Trawler Diane Marie, Inc.* ("*Eyak I*"), 154 F.3d 1090, 1095-97 (9th Cir. 1998), a different panel of this court held that the paramountcy doctrine barred plaintiff Villages from asserting exclusive rights on the OCS based on aboriginal title. We took this case en banc to reconcile our conflicting precedents.

Relying on *Eyak I*, the Secretary argues that the paramountcy doctrine automatically extinguishes aboriginal rights on the OCS. According to the Secretary, aboriginal rights exist on the OCS *only after they have been affirmatively recognized* by the federal government in a statute or treaty. The Secretary is correct that the federal government has ultimate control over aboriginal rights, but he has the doctrine backwards. Under long-established law, aboriginal rights exist *until affirmatively extinguished* by Congress. *See, e.g.*, *Santa Fe Pac. R.R. Co.*, 314 U.S. at 347 (aboriginal rights need not "be based upon a treaty, statute, or other formal government action"). "[C]ongressional intent to extinguish Indian title must be plain and unambiguous and will not be lightly implied." *Cnty. of Oneida v. Oneida Indian Nation of N.Y.* ("*Oneida II*"), 470 U.S. 226, 247-48 (1985) (internal quotation and citations omitted)). Here, neither the district court nor the Secretary has identified any plain and unambiguous intent by Congress to extinguish aboriginal rights of the Chugach on the OCS. *See Gambell III*, 869 F.2d at 1280 (finding it "clear"

that the settlement provisions of the Alaska Native Claims Settlement Act "do not extinguish aboriginal subsistence rights that may exist in the OCS").

We manifestly erred in *Eyak I* by ignoring the "great difference" between asserted state ownership of the seabed, at issue in the federal paramountcy cases, and aboriginal use and occupancy rights, at issue in that case. *Sac & Fox*, 383 F.2d at 997 (aboriginal rights are "not the same as sovereign or legal title"); *see also* FELIX COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 998 (2005 ed.) ("*[Eyak I]* seems to be wrongly decided, given the differences between state title and Indian title."). In the paramountcy cases, states sought to lease the seabeds off their shores for oil and gas exploitation without the consent of, and to the exclusion of, the federal government. *See, e.g.*, *California*, 332 U.S. at 23, 38; *Louisiana*, 339 U.S. at 701. State control of the seabed posed a threat to national interests because the states, if they were owners of fee simple title, could sell or convey those rights without the federal government's consent. *California*, 332 U.S. at 29, 35; *see also N. Mariana Islands v. United States*, 399 F.3d 1057, 1062-63 (9th Cir. 2005) (applying paramountcy doctrine to Commonwealth of the Northern Mariana Islands' claimed ownership of submerged lands off its coast).

In stark contrast to the states' asserted title as against the federal government in the paramountcy cases, aboriginal rights presume ultimate federal sovereignty and control. *See Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955) ("[Aboriginal title] is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties . . . ."). Whereas the states sought to establish ownership exclusive of the federal government in the paramountcy cases, aboriginal rights prevail only against parties other than the federal government. *See Oneida Indian Nation of N.Y. v. Oneida Cnty.* ("*Oneida I*"), 414 U.S. 661, 667 (1974) (describing aboriginal title as "good against all but the sovereign"); *Village of Gambell v.*

*Clark* ("*Gambell I*"), 746 F.2d 572, 574 (9th Cir. 1984) ("[Aboriginal] rights are superior to those of third parties, including the states, but are subject to the paramount powers of Congress."). Unlike fee simple rights, aboriginal rights cannot be sold or leased to third parties without the federal government's consent. *See Oneida II*, 470 U.S. at 234; 25 U.S.C. § 177 ("No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."). If aboriginal rights conflict with the national interest, Congress may extinguish those rights, even without paying compensation, so long as its intent is plain and unambiguous. *Tee-Hit-Ton*, 348 U.S. at 284-85; *Oneida II*, 470 U.S. at 247-48.

In *Eyak I*, we misconstrued the Chugach's claim as seeking "complete control over the OCS." 154 F.3d at 1096. The Chugach do not claim fee simple ownership in the OCS or a concomitant power to convey their interest to third parties. Rather, the Chugach seek only recognition of their aboriginal rights of use and occupancy in part of the OCS. We erred in *Eyak I* by stating that there was no "practical difference" between the relief sought by the Chugach and the relief sought by states in the paramountcy cases. *Id.* at 1095-96. The Chugach's asserted aboriginal rights are in no way comparable to the states' asserted right to fee simple ownership of offshore submerged land and a concomitant right to lease those lands to third parties without the consent of the federal government. As we wrote in *Gambell III*, the Chugach "are not asserting a claim of sovereign rights. Rather, they contend that they possess rights of occupancy and use that are subordinate to and consistent with national interests. This argument is persuasive." 869 F.2d at 1276.

I would overrule *Eyak I* insofar as it held that the paramountcy doctrine is inconsistent with the existence of aboriginal rights. I would reaffirm our holding in *Gambell III* that

aboriginal rights may exist on the OCS without undermining the paramount federal interest.

### III.   Remand

The district court on remand from our en banc panel did not apply the test for aboriginal rights articulated in *Sac & Fox*. The court's conclusion that the Chugach's pre-contact hunting and fishing activities "did not give rise" to aboriginal rights on the OCS was premised on legal errors.

First, the district court assumed incorrectly that the law required the Chugach to show an ability to exclude others from the claimed area, even in the absence of evidence of use by others. It wrote:

> [N]one of the ancestral villages was in a position to control or dominate access to any part of the OCS. The area was too large; and the number of men of an age who would have been able to defend or control high seas marine areas were too few. . . . None of the ancestral villages was in a position to occupy or exercise exclusive control over any part of the OCS on a sustained basis.

The district court did not understand that, in the absence of evidence of use by other groups within the claimed area, the Chugach could establish exclusivity simply by showing their own use and occupancy. The Chugach did not need to show that they were able to exclude hypothetical intruders.

Second, as the singular "none" and "was" in the above passage illustrate, the court mistakenly analyzed the aboriginal rights of individual plaintiff Villages, as opposed to the Chugach as a whole. The district court found that the Chugach were culturally, ethnically, and linguistically related, and were "recognized by themselves and others as Chugach." The court's separate finding that the Villages were politically

independent is immaterial. *See Northern Paiute Nation v. United States*, 7 Ind. Cl. Comm. 322, 416 (1959) (recognizing aboriginal rights for tribal group that lacked "political unity" but shared "similarities of language and culture"). The court's finding that the Villages had separate hunting and fishing "access" and did not regularly engage in joint hunting or fishing trips is similarly immaterial, so long as the Chugach commonly used hunting and fishing areas. Here, the Chugach "found their sustenance largely in marine waters" and traveled to the same areas of the OCS to hunt and fish. These findings are analogous to other cases that recognized aboriginal rights where autonomous villages shared hunting and fishing areas. *See, e.g.*, *Upper Skagit Tribe v. United States*, 8 Ind. Cl. Comm. 492, 497 (1960) (recognizing aboriginal rights where villages "extracted their principal sustenance from the same areas"); *Suquamish Tribe v. United States*, 5 Ind. Cl. Comm. 158, 164 (1957) (recognizing aboriginal rights where villages "shared gathering, fishing and hunting areas"); *Muckleshoot*, 3 Ind. Cl. Comm. at 674-75 (recognizing aboriginal rights where "fishing waters were used in common by the occupants of all the villages"). Accordingly, the district court should have analyzed the claimed aboriginal rights of the Chugach as a whole.

Because the district court concluded that the Chugach's pre-contact activities "did not give rise" to any aboriginal rights on the OCS, it did not make findings identifying the precise areas that the Chugach used and occupied exclusively. I would remand to allow the district court to make such findings.

## Conclusion

The district court acknowledged that the Secretary's challenged regulations are "fatally arbitrary" if the Chugach have aboriginal fishing rights in the OCS that have not been preempted under the paramountcy doctrine. Because I would hold that the Chugach have established aboriginal rights in at

least part of the claimed area of the OCS and that these rights do not conflict with federal paramountcy, I would reverse and remand with instructions to the district court to find precisely where within the claimed area the Chugach have such rights. Once it makes those findings, the district court would be in a position to deal appropriately with the challenged regulations.